717 So.2d 1263 (1998)
Nathaniel CALDWELL, et al., Plaintiffs-Appellees,
v.
LET THE GOOD TIMES ROLL FESTIVAL, et al., Defendants-Appellants.
Nos. 30800-CA to 30805-CA.
Court of Appeal of Louisiana, Second Circuit.
August 25, 1998.
*1264 Barham & Warner by Richard G. Barham, Shreveport, for Defendants-Appellants Rho Omega Chapter of Omega Psi Phi Fraternity and Ohio Casualty Insurance Co.
Cook, Yancey, King & Galloway by Sidney E. Cook, Jr. and Lisa Dunn Folsom, Shreveport, for Defendants-Appellants City of Shreveport, Downtown Shreveport Unlimited and First Financial Insurance Co.
Kelly W. Strickland, Shreveport, for Defendant-Appellant Wayne Reed d/b/a Bossier Tent Rentals and Louisiana Insurance Guaranty Association.
Richie & Richie by Byron A. Richie, Shreveport, for Plaintiffs-Appellees Nathaniel Caldwell; Audrey Murray, Ind. and as Tutrix of minor son, Johnathan Tramell; Victoria Wallace, as Tutrix of minor daughters, Demetrice Dillard and Sharetta Dillard; Shonda King; Kathy Perry; Veronica L. Howard; Sharon Burford; and Georgia Williams.
Alma S. Jones, Bossier City, for Plaintiff-Appellee Kennedy A. Williams.
William B. "Pete" King, Ronald J. Miciotto, Shreveport, for Plaintiff-Appellee William Reasonover, Tutor of Tyra Reasonover.
William C. Monroe, Shreveport, for Plaintiff-Appellee Gwendolyn Taylor, in the interest of her minor child, Timothy Taylor.
Neil Martin Trichel, Shreveport, for Sylvia Lee Mann.
Lunn, Irion, Johnson, Salley & Carlisle by James A. Mijalis, Shreveport, for Intervenors Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana.
Before MARVIN, C.J., and NORRIS and BROWN, JJ.
MARVIN, Chief Judge.
From a judgment in each of these consolidated actions that arose out of a tornadic force wind burst that caused flying debris to injure the several plaintiffs attending a public festival [Let the Good Times Roll] on the Shreveport riverfront on June 19, 1992, three of the several defendants, who co-sponsored the event, and two liability insurers appeal a judgment after a jury trial that allocated fault equally between them and awarded damages [after JNOV] to the several plaintiffs.
The three co-sponsor appellants are the City of Shreveport, owner of the riverfront property; Downtown Shreveport Unlimited [DSU], often a co-sponsor and promoter of such public festivals on city property; and the local chapter of a fraternity, Omega Psi *1265 Phi [Omega], the co-sponsor that provided the entertainment and vendors of souvenirs, food and drink for the two-day festival. One liability insurer-appellant named Omega as its insured, while the other named the festival promoted by Omega [hereafter Good Times] as its insured. These insurers were cast in solido in the judgment.
Because we find the jury's answers to verdict interrogatories inconsistent and that the trial court did not follow the dictates of La. C.C.P. art. 1813(E), we conduct a de novo review of the record.
We reverse and render judgment rejecting the demands of the several plaintiffs.

PREFACE
The premise of the liability of the co-sponsors of the Good Times festival may be summarized: During the daytime, Friday, June 19, 1992 the weather at the festival was hot, sunny and dry until shortly after 8:00 p.m. when the weather began to worsen, beginning with rain. Following weatherband broadcasts of a severe weather watch in counties in Arkansas and Texas, the National Weather Service (NWS) broadcast a severe weather warning for an area that included Caddo Parish to the Shreveport NWS [SHV-NWS] facility at 8:13 p.m. This broadcast was updated and rewritten by SHV-NWS and broadcast by SHV-NWS on its weather radio frequency a few minutes after 8:13 p.m. A verbal summary of this warning was thereafter relayed to the Shreveport fire and police radio dispatcher, who then broadcast on the Shreveport fire and police radio band a severe weather warning tone to alert all Shreveport officers.
Omega had hired off-duty uniformed police officers to provide safety and security at the festival. These officers heard the broadcast of the severe weather warning tone only shortly before the tornadic force wind was produced about 8:45 p.m. from the escalating storm that had been in progress on the riverfront since shortly after 8:00 p.m.
Appellants acknowledge they did not otherwise have means to monitor SHV-NWS weather broadcasts. Appellants emphasize force majeure or Act of God, arguing no cause in fact by their respective conduct or omission, and more specifically, that any legal duty which might have been owed to those attending the festival did not extend to protecting against the particular risk of a tornadic force wind burst being produced by a severe thunderstorm.

FACTS
Under the auspices of the City and DSU since 1987, Omega had sponsored an annual public celebration on or about June 19 in those years, called in 1992 "Let the Good Times Roll Festival." For three or four years before 1987, such a festival on or near June 19 had been co-sponsored by entities other than Omega with the same support from the City and DSU. The City and DSU had promoted and co-sponsored other annual public festivals for longer periods of time in downtown Shreveport.
The 1992 Good Times festival featured the celebrated blues singer and entertainer Irma Thomas, of New Orleans, who was scheduled to perform at 8:30 p.m. on Friday, June 19, 1992 on stage under a large tent, 60 × 140 feet, which sheltered a stage and 1,000 chairs. Omega rented this and other tents from Bossier Tent Rentals, a co-defendant who was not found at fault by the jury.

Contractual Responsibilities
A written contract between DSU and Omega set forth their respective responsibilities for the physical layout, staffing and promotion of the 1992 Good Times festival. DSU agreed to provide what the contract calls "technical assistance," otherwise undefined, and to assist in development of the site plan and to provide some of the required work force and equipment, including street barricades, stage, lights and sound, utility connections, and 1,000 chairs and some tables.
Omega agreed to pay DSU a percentage of the revenue generated by the festival and other direct labor expense incurred by DSU or the City and to provide public liability insurance insuring the festival and to hold harmless or indemnify the City for damages that might be claimed by those attending the festival. Already insured by one liability insurer, Omega purchased a second policy of liability insurance from another insurer to comply with the contract requirement. Omega *1266 and DSU had a mutual hold harmless agreement.
Omega also contractually agreed to provide entertainment, vendors' booths and staffing, food, drink, souvenirs, sanitary facilities, volunteer labor, and security personnel [off-duty police officers] in accord with the requirements of the Shreveport Chief of Police.
Patrons were not charged admission to attend the festival or the entertainment it featured, including the Irma Thomas performance. Any loss or profit from the production of the festival would go to Omega as the financing co-sponsor. The City, of course, provided the riverfront site. In accord with the contract, four uniformed but off-duty Shreveport police officers, as required by the police chief, were assigned and were present to oversee and provide security and safety and crowd control at Omega's expense.
The June 19, 1992 weather was described as typical for that time of the year, hot sunshine during the day. At 5:25 p.m., the first weather advisory concerning the storm system that later hit the riverfront was issued by the Shreveport local station of the National Weather Service [SHV-NWS]. This advisory was of a severe thunderstorm watch in effect for central Arkansas across extreme northeast Louisiana and west central Mississippi, noting a band of strong to severe isolated thunderstorms, with winds of up to 50 to 70 miles per hour in central Arkansas extending from 30 miles east of Oklahoma City, OK to near McAlester southeast of Fort Smith, AR. Weather experts explained that any thunderstorm producing winds of 58 mph is called a severe thunderstorm.
The Shreveport riverfront remained sunny and warm until about 8:00 p.m. when clouds and winds, typical of a June rainstorm, appeared. Sometime after 8:00 p.m. drizzling rain began on the riverfront before Irma Thomas took the stage.
At 8:13 p.m., a severe thunderstorm warning was issued for the Shreveport area [four parishes, including Caddo, in northwest Louisiana] by NWS to the local NWS station at the Shreveport Regional Airport some 6.5 miles west of the riverfront festival site. Within minutes, that NWS warning was rewritten and relayed in the Shreveport area over the public weather radio band and on the SHV-NWS weather wire to all news media subscribers to the wire. The local SHV-NWS forecaster then followed the customary practice of telephoning the City's police and fire dispatcher, giving the gist of the warning, as well as other fire and police radio dispatchers in the area.
Irma Thomas's performance under the tent began shortly after 8:30 p.m. before a capacity crowd. About 8:45 p.m. the off-duty police officers working the festival received the "tone" on the police radio frequency indicating a severe weather warning for the Shreveport area. About the time the tone was transmitted on the police frequency and before the off-duty police at the festival had time to respond to the signal, one or more violent gusts of wind, estimated at up to 75 mph, hit the riverfront, uprooting the main tent from its moorings, twisting and breaking poles, causing chains securing the tent to stakes to break, and tent stakes to pull out of the asphalt and ground below, eventually collapsing the tent.
Some persons under the tent were struck by tent poles, chains and debris connected with the tent and by other debris in the area violently propelled by the wind gusts. Two persons among those who escaped the tent were struck and injured by a metal sign unconnected with the tent that was propelled by the wind burst.
The events at the SHV-NWS station and expert opinion about the weather will be discussed more fully later in this opinion.

Procedural Posture
The plaintiffs in the five consolidated cases contended that the three co-sponsor appellants were negligent in failing to warn of the impending severe weather and that Wayne Reed, d/b/a Bossier Tent Rentals, rented and erected a tent that was defective or improperly constructed so as to constitute an unreasonably dangerous thing.
The jury's answers to verdict interrogatories found:
 (1) that the plaintiffs' injuries were the result of an Act of God;
*1267  (2) that the accident could have been foreseen and the injuries avoided by the exercise of reasonable diligence and care, or by use of those means which the situation rendered reasonable to employ by any of the defendants;
 (3) that Omega, the City and DSU were negligent, and their negligence was a legal cause of the plaintiffs' injuries;
 (4) that Bossier Tent Rentals was not negligent; and
 (5) that none of the plaintiffs was negligent with regard to their own injuries.
The jury allocated 33-1/3 percent negligence each to Omega, the City and DSU and assessed damages in favor of the younger plaintiffs, but not to six adult plaintiffs.
By the jury's answers to the verdict interrogatories two plaintiffs were awarded specific amounts for medical expenses and a few elements of general damages; five plaintiffs were awarded medical expenses only and no general damages. Six of the seven plaintiffs awarded damages were minors under age 18, the seventh plaintiff having just reached 18 about June 19, 1992.
To six other plaintiffs, all adults, the jury awarded no damages, special or general [-0-]. The names of the two remaining plaintiffs were inadvertently omitted from the jury interrogatories.
The trial court denied defendants' request to order the jury to further deliberate about damages pursuant to La. C.C.P. art. 1813(E), and instead ordered the jury's verdict recorded and held a private, off-the-record conference with the jury outside the presence of counsel before dismissing the jury.
Two plaintiffs whose names were inadvertently omitted from the jury interrogatories filed rules requesting the trial court to make a finding as to their respective damages. These rules were granted. The remaining plaintiffs filed JNOV motions, asking the trial court to award or increase damages. The plaintiffs, as well as Omega and its insurer, Ohio Casualty, also filed rules asking the trial court to rule on other issues relating to liability insurance coverages, who insured whom for what.
Appellants unsuccessfully moved for a new trial and JNOV in their favor, contending the jury verdict was inconsistent in terms of liability and damages.
In its judgment, the trial court increased the damages awarded by the jury to certain plaintiffs, and awarded general damages to those plaintiffs who had been awarded no damages or only medical expenses by the jury verdict. On the insurance coverage issues, the court held that the two liability insurers from whom Omega had purchased insurance were solidarily liable to plaintiffs, but pretermitted resolution of the issues of policy coverage, contribution and indemnity.

Standard of Review
Review of legal cause, whether styled as the scope of duty or as the extent of the particular risk of injury protected against, is a question of law to be determined by the court. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984); Mathieu v. Imperial Toy Corporation, 94-0952 (La.11/30/94), 646 So.2d 318.
Where a jury's answers to verdict interrogatories are patently inconsistent, a trial court is directed either to return the matter to the jury for further consideration or to order a new trial. La. C.C.P. art. 1813(E) mandates that a trial court shall follow one of the prescribed procedures, and shall not direct the entry of judgment. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742.
The jury found Omega, the City and DSU negligent, and that negligence a factual and legal cause of the plaintiffs' injuries. By answering "0" as the award for all adult plaintiffs other than the plaintiff who turned 18 at the time of the injury, the jury declined to award damages for obvious injury to the older plaintiffs. Finding liability, but awarding no damages to a particular class of plaintiffs, each of whom clearly produced uncontradicted evidence of injury and stipulated medical expense, is an inconsistency in the jury answers within the contemplation of Art. 1813(E). Over the objection to the verdict on this basis by appellants, the trial court ordered the entry of the verdict.
*1268 The trial court's failure to follow the course of action prescribed by Art. 1813(E) after timely objection by the defendants is a legal error which may have interdicted the fact-finding process. In such cases, and where the appellate record is complete, the appellate court is to conduct an independent de novo review of the record and render judgment in accord with the preponderance of the evidence in the record. Ferrell, supra, 94-1252 at 7, 650 So.2d at 747. See also La. C.C.P. art. 2164.

The Weather
Two expert witnesses explained the weather: Ernie Ethridge, meteorologist for a number of years, including 1992, at the Shreveport Regional Airport for NWS, and Mike Pass, formerly a meteorologist at NWS offices in various states and more recently a television weather forecaster in Shreveport.
At the Shreveport Regional Airport, 6.5 miles west of the riverfront, the SHV-NWS station registered winds at 52 mph at 8:56 p.m., 62 mph at 9:00 p.m. and 66 mph at 9:03 p.m. Barksdale Air Force Base recorded gusts of 52 mph at 8:52 and 8:56 p.m. The winds from these storms at the riverfront generally were estimated to have been 50-60 mph, similar to the periodical peak recordings at the airport and BAFB.
These recorded winds were not micro bursts, but typical winds in a severe thunderstorm. The experts agreed that what they called a "micro burst," or sudden and violent wind gust with twisting force near the ground, uprooted the tent and produced the debris that caused the injuries to the several plaintiffs, reaching a tornadic force of 75 mph.
Of the 100,000 thunderstorms affecting the continental United States each year, 34 percent are accompanied by winds up to 50 mph, 10 percent by winds up to 58 mph and 3.5 percent by winds up to 75 mph. Not all severe thunderstorms produce a 75 mph twisting wind or micro burst. Many of the 3.5 percent of thunderstorms that produce 75 mph hurricane force winds are in fact hurricanes that primarily affect coastal areas. Remnants of hurricane winds reaching Shreveport that are generated in or through the Gulf of Mexico had never produced 75 mph winds in the Shreveport area, according to the weather experts.
The NWS anemometer at the Shreveport Airport had recorded only eight micro bursts from 1951 through 1991. The experts did not specifically compare the velocity of those micro bursts with the estimated 75 mph velocity of the burst(s) at the 1992 Good Times festival. While the experts did not speculate about the number of micro bursts occurring throughout the Shreveport-Bossier metropolitan area in the 40 years before 1992, the record supports the inference that micro bursts of a similar degree of frequency over a 40-year period occur at any location in the area other than at an NWS or military station that records such micro bursts. A wind or micro burst reaching 75 mph, nonetheless, rarely occurs in the Shreveport weather tracking area.
The experts defined a severe thunderstorm as a storm that produces either or both winds of 50 knots per hour [58 miles per hour] and three-quarter inch hail. A thunderstorm watch means that conditions are favorable for some thunderstorms to occur within some, but not all areas from 65 statute miles on either side of the line of storms being tracked. Ethridge detailed NWS's tracking of the system that impacted the Shreveport-Bossier area on June 19, 1992. He explained that storm systems undergo changes when tracked over a period of time, and may increase or decrease in intensity, or even "fall apart."
SHV-NWS records or statements show a 2:45 p.m. tracking of a storm moving away from northeast Louisiana toward Mississippi on June 19, 1992. At 5:25 p.m. an SHV-NWS advisory mentioned that Shreveport NWS "showed isolated severe thunderstorms 30 miles east of Oklahoma City to near McAlester, southeast of Fort Smith, AR." At 7:13 p.m. SHV-NWS warned of severe thunderstorms for three counties in southwest Arkansas and one county in northeast Texas.
A warning signifies that the weather service has strong evidence that a severe thunderstorm is in progress or will approach very quickly. The 7:13 p.m. NWS severe thunderstorm warning (STW) broadcast in Shreveport was for counties in Arkansas and *1269 one county in northeast Texas. This STW predicted wind speeds of 50 to 60 miles per hour and possible small hail and strong winds to be expected ahead of the storm.
In the meantime, the weather for the festival on the riverfront remained sunny and warm until after 8:00 p.m. when the rain began. At 8:13 p.m., NWS transmitted a severe thunderstorm warning to Shreveport NWS for northwest Louisiana, including Bossier, Caddo, Claiborne and Webster Parishes. A few minutes later, SHV-NWS produced and broadcast the warning over the local weather radio and then over a wire to all news media outlets subscribing to the wire.
After SHV-NWS transmits the warning by radio and then by wire, SHV-NWS telephones, among other authorities, Shreveport's police and fire dispatcher telling of the warning. That dispatcher transmits by radio the severe weather warning tone to Shreveport police officers. News media subscribers to the wire receive the entirety of the SHV-NWS written warning, editing and condensing it for broadcast to the public, according to Ethridge and Pass. The Shreveport NWS advisory that was written and later read on the SHV-NWS weather radio band several minutes after 8:13 p.m. is reproduced in part:
The National Weather Service in Shreveport has issued a severe thunderstorm warning effective until 9:45 p.m. CDT for people in the following locations ...

In northwest Louisiana ... Bossier Parish... Caddo Parish ... Claiborne Parish... Webster Paris[h.] At 8:05 p.m. CDT National Weather Service radar in Shreveport indicated a band of strong to severe thunderstorms over southern Arkansas and adjacent areas of northeast Texas moving south-southeastward into northern Louisiana.
The showers and thunderstorms were moving to the south-southeast at 30 to 35 mph.
High winds ahead of the band of thunderstorms have produced tree and power line damage in southwestern Arkansas ... southeastern Oklahoma and extreme northeastern Texas. Winds in excess of 60 mph can be expected ahead of these storms. Heavy rain ... strong gusty winds ... frequent lightning can be expected with the band of thunderstorms.
A severe thunderstorm watch remains in effect for northern Louisiana ... extreme northeastern Texas ... southern Arkansas... and central Mississippi until 1:00 am CDT.

* * * * * *
Severe thunderstorms produce damaging winds in excess of 55 mph ... destructive hail ... deadly lightning ... and very heavy rain. For your protection move to an interior room on the lowest floor of your home or business. Heavy rains flood roads quickly so don't drive into areas where water covers the road.
(Our emphasis.)
Ethridge explained the gust or burst of wind which brought down the Good Times tent was a "micro burst," a twisting wind of up to 75 mph, based on his experience estimating wind speed. A micro burst twists and breaks trees and poles near the ground. A micro burst that affects aircraft is sometimes called a wind shear. By whatever name, this type wind is extremely destructive.
A micro burst is described as a burst of wind of very small scale [from a few yards across to 300 or 400 meters across, and by definition one mile or less in scale] descending out of the base of a cloud near the ground, creating an outflow, downflow or backflow of wind. A backflow is a down burst with a rapid change in either or both wind direction and speed. A micro burst is usually associated with a dying storm. In this case, there was a squall line of several thunderstorms [nearly or mostly solid line of thunderstorms with a few breaks that produces a squall of wind, i.e., a jump in wind speed similar to a gust but lasting longer, easily getting up to 60 to 80 miles per hour]. A micro burst is a possibility with any thunderstorm.
Wayne Reed, of Bossier Tent Rentals, testified he had observed a tent similar to the one leased to Good Times withstand winds of up to 50 mph, and that he did not anticipate the Good Times tent would be collapsed by the wind in a severe thunderstorm. He did not know the top velocity of winds the Good Times festival tent could withstand. Somewhat ill on the evening of June 19 and at *1270 home, Reed had seen the brief summary of the severe thunderstorm warning on the television weather channel. He drove through the storm to the riverfront to see if the organizers needed any assistance with any of the tents he had rented to Omega. Reed and other witnesses each expressed they had no reason to foresee or anticipate the tent would come down in the storm. Reed did acknowledge in hindsight, that if he had been in charge of the festival and had known there was a possibility or prediction of winds up to 60 mph in that area, he would most likely have sought to evacuate the tents.
Weather was always a concern for festival organizers simply because thunderstorms are commonplace in Shreveport during the summer, according to the experts and the appellants' witnesses. DSU did not advise, nor did Omega suppose, that their respective personnel needed weather radios to monitor the weather. Omega witnesses explained they relied on the hired off-duty Shreveport police officers to provide for the security and safety of the festival patrons.
The response to the threat of lightning was left to the person who furnished and monitored the sound equipment for the festival entertainment. That person determined whether and when the sound equipment was endangered by the weather. If that person deemed the equipment was endangered, he or she would disconnect the equipment and direct that the entertainment be discontinued.
Plaintiffs, as well as the defense lay witnesses, testified that the burst of wind they experienced on the evening of June 19, 1992 was like nothing they had ever experienced before. Two witnesses testified that after the 1992 Good Times festival they experienced a similar force at a later time from a tornado that hit the school where they both taught.
This record supports the conclusion that the violent winds and thunderstorms that hit the Shreveport riverfront on June 19, 1992 constituted a singularly uncommon event. No incident of a similar micro burst or a wind of such force had occurred at the Good Times festival in the festival's 11-12 year history at the time of trial. Further, no evidence was presented with respect to any similar incident at any of the number of annual festivals held in Shreveport, many of much longer duration than the Good Times event. In some instances, however, sound equipment at a festival apparently had been turned off when threatened by lightning in a thunderstorm.

Standard of Care
Neither the law nor the contract imposes on the appellant-sponsors of an outdoor festival a specific obligation to monitor, and then respond to, NWS transmitted warnings or watches of the possibility of a tornadic force wind of 75 mph [produced by 3.5 percent of the 100,000 thunderstorms tracked each year by NWS across the nation] or of the 10 percent of those 100,000 thunderstorms that are called severe thunderstorms by NWS, producing winds up to 58 mph.
Ethridge explained that in the 54 thunderstorm "days a year [in the SHV-NWS tracking area], there have been several other micro bursts over the period of time from 1951 to 1991, but not thousands. Thousands [of micro bursts] would require a very, very long period of time." Our brackets.
The record does not disclose any particular custom or industry practice observed by festival hosts or organizers with respect to severe thunderstorm warnings.

DISCUSSION

Plaintiffs' burden of proof
A cause of action in negligence incorporates four elements of proof:
(1) that the conduct complained of was a cause-in-fact of the harm which occurred;
(2) that the defendant owed a duty to the plaintiff which encompassed the particular risk that caused the harm to the plaintiff;
(3) that the defendant breached the duty; and
(4) that the plaintiff suffered actual damages.

Harris v. Pizza Hut, supra, 455 So.2d at 1370.

Cause-in-fact
Cause-in-fact analysis is a "but for" inquiry to determine whether the damages *1271 would not have occurred but for the defendant's conduct. The analysis is sometimes discussed in terms of whether a defendant's conduct in question is a substantial factor in causing the injury. In whatever terms, the analysis of cause in fact should not support, in the broadest sense, a result that borders on the absurd or that unreasonably or remotely connects or substantially relates particular conduct to the injury. See Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La. L.Rev. 363 (1970); Malone, Ruminations on Cause-in-Fact, 9 Stan. L.Rev. 60 (1956).
Our factual inquiry is specific: Would the plaintiffs have been injured but for the failure of one or more of the three appellants to timely warn them at or before 8:30 p.m. that the escalating thunderstorm in progress on the riverfront might produce one or more wind bursts dangerous to life and property?
We relate and compare the above summarized circumstances of the 1992 Good Times festival to the decade or more of the history in the record of that and other public festivals in Shreveport. We also take notice that severe thunderstorms during an Independence Bowl football game, annually held for more than two decades in Shreveport in December, have more greatly affected attendance or caused departure of much of the game crowd, but have not canceled or aborted any Independence Bowl game.
In the light of the above factual circumstances and rhetorically in this analysis, we pose this hypothesis: If the appellants had monitored, with weather radios, weather broadcasts throughout the entire day and night of June 19, 1992, would the appellants have canceled or aborted the featured performance of Irma Thomas at or shortly after the time it began about 8:30 p.m., and, if so, would the crowd in attendance have heeded timely advice by any appellant either to take shelter or to depart from the riverfront?
In the New Testament, scripture reports Jesus Christ as saying to "crowds, When you see a cloud rising in the west, you immediately say, `It is going to rain', and so it happens. And when you see the south wind blowing, you say, `There will be scorching heat', and it happens.... [Y]ou know how to interpret the appearance of earth and sky ..." Luke, 12:54-56 (NRSV).
Most animals, especially we who are in the higher order, do not have to be told or warned about the vagaries of the weather, that wind and clouds may produce a rainstorm; that a rainstorm and wind and rain may suddenly escalate to become more severe and dangerous to lives and property. A thundershower may suddenly become a thunderstorm with destructive wind and lightning. A thunderstorm in progress may escalate to produce either or both tornadoes and hail, or even a rare and unexpected micro burst as we have learned from this record, all of which are extremely destructive to persons and property.
The expert testimony supports the conclusion that a micro burst [sudden twisting 75 + mph wind near the ground] is a relatively rare phenomenon, or a possibility from a severe thunderstorm, the occurrence of which even professional meteorologists cannot accurately predict [e.g., aircraft being brought down by a wind shear near airports under the watchful equipment and eye of professionals employed by NWS and by airports to monitor the weather].
The failure to give a warning of the obvious [e.g., do not slide down the icy hillside toward the light standards on the parking lot below] may not be a cause in fact of injury or a breach of duty by a custodian-defendant who invites sledding. See Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585. Similarly, a cause in fact of injury to those who are under a tent in the midst of a thunderstorm in progress cannot be the tent custodian's failure to warn that the thunderstorm may escalate or worsen and produce what thousands of years experience of humankind has taught us: Wind and rainstorms may escalate into more severe thunderstorms producing dangerously violent and destructive weather phenomena, hurricanes, tornados, high and dangerous winds, flooding, hail and the like.
In short, on this record, we must conclude that the jury's finding of cause in fact is tenuous at best.

*1272 Force Majeure; Act of God

An Act of God in common law terminology is a concept similar to the civilian doctrine of force majeure, a superior or irresistible force that is, in the legal sense, sufficient to excuse a defendant's neglect of a duty and relieve him of liability to a plaintiff. This concept, or defense, which excuses a defendant from liability, has been defined as:
a providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care or by the use of those means which the situation renders reasonable to employ.

Southern Air Transport v. Gulf Airways, 215 La. 366, 40 So.2d 787, 791 (La.1949).
An Act of God is an unusual, extraordinary, sudden, and unexpected, manifestation of the forces of nature which man cannot resist. The fact that no human agency can resist an Act of God renders misfortune occasioned solely thereby a loss by inevitable accident which must be borne by the one upon whom it falls....

Rector v. Hartford Acc. & Indemnity Co., 120 So.2d 511, 515 (La.App. 1st Cir.1960).
An injury caused by an Act of God is an injury due directly and exclusively to natural causes which could not have been prevented by the exercise of reasonable care and foresight. Recovery for injuries caused by extreme weather conditions may be precluded by the application of this rule. Rector v. Hartford, supra, p. 515.
When an Act of God combines or concurs with the conduct of a defendant to produce an injury, the defendant may be held liable for any damages that would not have occurred but for his own conduct or omission that constitutes a breach of a specific legal duty owed by the defendant. See Saden v. Kirby, 94-0854 (La.9/5/95), 660 So.2d 423, discussed and distinguished infra.

Festival Organizers' Liability
Even assuming, arguendo, but not finding, cause in fact, we also conclude that any duty owed by the defendants responsible for organizing and operating the festival, DSU[1] and Omega, is not a specific, but only a general duty to use reasonable care to avoid creating an unreasonable risk of harm to those who attend the public festival.[2]
When a plaintiff relies on a general rule of law, such as La. C.C. art. 2315, as the basis for a tort claim, the court must determine whether the rule is intended to protect that plaintiff from the particular risk of harm he suffered. This analysis considers causation, factual and legal, and the source and scope of the duty urged. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229, 233.
Courts consider various policies or factors that a legislature might consider, such as whether the imposition of a duty would result in an unmanageable flow of litigation; ease of association between the plaintiff's harm and a defendant's conduct; economic, social and moral implications on similarly situated parties; the nature of defendant's activity; and the direction in which society and its institutions are evolving. Precedent is also considered. See generally, Meany, supra; Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988); Entrevia v. Hood, 427 So.2d 1146 (La.1983).
The assault of the riverfront area on June 19, 1992, by this extraordinarily strong component of the line of thunderstorms, as opposed to some other area, contains such a vast element of chance that we find it difficult to associate what plaintiffs urge as the appellants' duty to warn plaintiffs with the risk of plaintiffs' being injured in a public place by an extremely dangerous, but also *1273 extremely rare, wind burst generated by a severe thunderstorm.
Certainly, the fact of the extremely strong and turbulent winds accompanying the storm, combined with the fact that those attending the public festival were sheltered underneath a tent which did not withstand the power of the winds, combined to create some danger to the public crowd. Likewise, those who gratuitously or for remuneration produce a public festival owe some duty to the public to provide, as is urged here, some "safety and security," but that duty, being owed to the public by all who serve the public (fire and police personnel), may not extend to protect the public against all possible risks of injury, especially when the injury stems from an extraordinary, rare and reasonably unexpected weather occurrence or circumstance.
No other weather event producing this much force had occurred on any other occasion in Shreveport involving a public festival, parade, celebration, contest or gathering, before or after this occurrence. Under the circumstances of this case, we find the extreme nature of the tornadic force wind was not an occurrence the reasonable festival organizer is bound to reasonably anticipate or foresee.
The festival organizers and the tent lessor expected the tent to be adequate protection and shelter for the crowd. Under conditions of average inclement weather, with winds of up to 50-60 mph, the plaintiffs probably would not have suffered their injuries because the tent was most likely capable of withstanding such winds, according to Wayne Reed of Bossier Tent Rentals, the lessor of the tent. He said he did not expect the tent to be uprooted and to collapse, even in the strong winds through which he drove from his home to the riverfront. The festival organizers should not be expected to foresee the combination of such extreme weather and the toppling of the tent [unexpected even by one who had substantial experience working with that particular tent and other tents] which created the risk of injury to the festival goers.
Thus, even assuming cause in fact, we do not easily associate a general duty to warn with the obvious risk of injury from a rare, extraordinary and highly dangerous micro burst produced by a severe thunderstorm. Policy reasons excuse the failure of any appellant to warn against such an extraordinary and unforeseeable risk. See and compare Roberts v. Benoit, 605 So.2d 1032 (La. 1991); Polk v. Blanque, 93-1740 (La.App. 4th Cir.3/15/94), 633 So.2d 1382; Gabler v. Regent Development Corp., 470 So.2d 149 (La. App. 5th Cir.1985).
Our result has been pronounced in other jurisdictions. In Dykema v. Gus Macker Enterprises, Inc., 196 Mich.App. 6, 492 N.W.2d 472 (1992), a spectator at a public outdoor basketball tournament with many games in progress suffered paralyzing injuries when a thunderstorm with 40 mph winds arose, causing him to be struck by a falling tree limb as he ran for cover. The spectator-plaintiff premised his action against the organizer or sponsor of the tournament on the defendant's failure to warn those in attendance of the approaching thunderstorm. Noting that no such duty had been recognized in Michigan or in any other jurisdiction, the court reasoned, "... the approach of a thunderstorm is readily apparent to reasonably prudent people, and ... therefore, it is one's own responsibility to protect himself from the weather." 196 Mich.App. at 11, 492 N.W.2d at 475.
The Michigan court cited as support for its decision Hames v. State, 808 S.W.2d 41 (Tenn.1991). There the court found that the general duty of reasonable care owed by the owner of a golf course to its patrons did not extend to impose on the owner a duty to warn its patrons of the obvious dangers of lightning in the approach of a severe thunderstorm.
Saden v. Kirby, supra, is easily distinguished: There, prolonged heavy rain and the failure of the pumps that ordinarily removed the rainfall caused the flooding of plaintiffs' homes. The defendant Sewerage & Water Board was found to have breached a specific duty to maintain and operate its drainage pumping station which had been designed and erected with tax revenue to remove the runoff of prolonged and heavy rainfall common to the area. The risk of flooding of plaintiffs' homes was easily associated with the specific duty of the Board to *1274 reasonably maintain and operate the pumping station that was funded, designed and erected for the purpose of removing reasonably expected heavy rainfall. 94-0854 at 13, 660 So.2d at 430.
Finally, in examining the nature of the defendants' activity and the economic factors relevant to this case, we note that festivals, parades and other community activities benefit a community in many ways. This particular festival had several declared purposes: exposing the citizens of Shreveport and surrounding communities to art in general and the art of African Americans in particular, and, as a secondary objective, increasing funds available for scholarships granted by Omega to disadvantaged youth in the area, promoting the downtown riverfront area of Shreveport, and encouraging minority and majority citizens to better understand, relate and associate with each other and have a "good time."
We cannot assume that a timely warning and the aborting or cancellation of the Irma Thomas entertainment would have avoided the tragedy. We decline to impose on these appellants the specific duty urged by plaintiffs.[3]

DSU's Duty
Furthermore, we find no evidence that DSU, by its contractual obligation to provide "technical assistance" to Omega for promoting and setting up the festival and necessary physical facilities on the riverfront, assumed the specific duty that is urged. Certainly, reasonable people would agree that inclement weather is detrimental to a festival. Monitoring the weather will not avoid this potential detriment. The occurrence or not of inclement weather at an inopportune time is not within human means to prevent. Therefore, holding oneself out as offering expertise or "technical assistance" in the staging of a festival does not amount to assuming a specific duty which encompasses within it the risk of ruin of the festival by the occurrence of inclement weather or, a fortiori, the risk of injury to those at a public festival as a result, or possibility, of an extraordinary phenomenon produced by a severe thunderstorm.

City's Duty
As we have found no liability on the part of the festival organizers and hosts in general, we need not address the City's contention that it was not a festival organizer or host having organizational control or responsibility for the Good Times festival and therefore it had no duty to those attending the festival.

Assumption of a Duty to Protect the Public From Severe Weather
The plaintiffs further argue that the principle of law expressed in Harris v. Pizza Hut, supra, that one who undertakes a task which he otherwise has no duty to perform is obligated to perform the task in a reasonable manner, is applicable to the City [as well as DSU, discussed above] in this case. The plaintiffs ascribe to the City the designing of a system to inform and protect the public from severe weather [apparently based on the existence of a direct telephone line from SHV-NWS to a city dispatcher]. Plaintiffs contend the City did not perform this task in a reasonable manner because the police radio dispatcher did not advise the officers in the field of the NWS weather advisory sufficiently far in advance of the storm affecting the riverfront to allow the officers to take action to protect the crowd. Plaintiffs urge there was at least a 25-minute delay in broadcasting the warning tone to off-duty officers and other police personnel.
The record does not demonstrate that the City either intended or designed a system to inform and protect the public from severe weather or assumed the task of monitoring the weather to alert the public. The record clearly shows SHV-NWS monitors the *1275 weather and verbally causes watches and warnings of severe weather to be communicated to various police and fire authorities as well as the various news media subscribers to the SHV-NWS wire service throughout the region covered by the SHV-NWS office. The purpose of SHV-NWS directly notifying local authorities of severe weather was not otherwise shown at trial.
Receipt of weather bulletins or advisories from SHV-NWS does not amount to assumption by the City of a duty to protect the public from severe weather. The police practice of notifying officers in the field of severe weather, of course, affords some protection to the officers and those members of the public who listen to the police radio band.
The plaintiffs contend that the City dispatcher's conduct in broadcasting the severe weather warning tone 25 to 30 minutes after its receipt was substandard conduct for which the City should be held responsible. On this record, we cannot conclude that this alleged failure was unreasonable under the circumstances. This record does not negate that the dispatcher engaged in other, perhaps more pressing and immediate radio traffic duties during the delay plaintiffs urge.
Another facet of plaintiffs' claim against the City is whether or not the City is responsible for the actions of the off-duty officers under principles of respondeat superior. On this record we cannot find the off-duty officers neglected any duty to plaintiffs or defendants. The off-duty officers received the severe weather warning tone just moments before the wind burst occurred and had no time to take preventive action. Plaintiffs do not urge any negligence of the off-duty officers other than their failure to better and more timely monitor and warn the crowd and sponsors of the severe thunderstorm in progress on the riverfront. We shall not further address the issue of control and vicarious liability of the City under these circumstances.

Bossier Tent Rental's Liability
The plaintiffs answered the appeal, contending the jury was clearly wrong in finding that Wayne Reed of Bossier Tent Rentals [BTR] was not negligent, while asserting in their briefs that the issue of BTR's negligence is raised in case appellants raise Reed's fault as a defense, or grounds on appeal to modify appellants' fault. No appellant mentioned fault on the part of BTR in assignments or error or in brief. The plaintiffs do not otherwise substantively raise BTR's negligence in their brief. This assignment of error raised in the plaintiffs' answer to the appeal is deemed abandoned. URCA Rule 2-12.4; Knotts v. Snelling Temporaries, 27,773 (La.App. 2d Cir.12/6/95), 665 So.2d 657.
Moreover, and in any event, on this record, we perceive no error in the jury finding Reed and BTR not at fault. We conclude this record establishes no fault on the part of Reed and BTR.

DECREE
The judgment of the trial court is hereby reversed and judgment rendered herein in favor of defendants, Omega Psi Phi, Downtown Shreveport Unlimited and the City of Shreveport, rejecting the demands of each plaintiff in the consolidated actions at the cost of each plaintiff.
REVERSED AND RENDERED.
NOTES
[1] While the plaintiffs assert the issue of DSU's negligence is not properly before this court because not raised in the assignments of error by appellants, we find that the second and third assignments of error raised in the brief on behalf of the City of Shreveport, DSU and First Financial assert the finding of negligence on the part of all defendants as error, and in briefing the issue of negligence and liability includes DSU and its alleged negligence in argument. The issue was thus adequately preserved for review by this court. La. C.C.P. art. 2129.
[2] The City's duty will be discussed separately as it involves other issues such as control of festival operations and the actions of city employees.
[3] Our policy determination in this regard is consistent with the expression of legislative policy in the enactment of statutes limiting the liability of parade presenters or organizers for loss in connection with Mardi Gras and other parades and festivities to loss occasioned by deliberate and wanton acts or gross negligence of the sponsoring or presenting organization. La. R.S. 9:2796 and 2796.1. This is not to suggest that the defendants in this case would only be held liable for deliberate and wanton or grossly negligent acts, as there is no limiting statute applicable here, but the enactment of such statutes demonstrates a public policy opposed to unduly extending the reasonably prudent standard of care to risks over which the organization has little or no control and which are not easily associated with a breach of the standard of care.