742 So.2d 113 (1999)
Jack EUBANKS, et al., Plaintiffs-Appellants,
v.
BAYOU D'ARBONNE LAKE WATERSHED DISTRICT, et al., Defendants-Appellees.
No. 32,334-CA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1999.
Writ Denied December 17, 1999.
*114 James M. Wilkerson, Jay B. McCallum, Farmerville, Counsel for Appellants.
Richard Ieyoub, Attorney General, Counsel for Appellees Bayou D'Arbonne Lake Watershed District and The Board of Commissioners of Bayou D'Arbonne Lake Watershed District.
Frances Jones Pitman, Assistant Attorney General, Walker, Tooke & Lyons by S. Judd Tooke, Abrams & Lafargue by Julie Lafargue, Counsel for Appellee State of Louisiana, DOTD.
Before WILLIAMS, STEWART and DREW, JJ.
STEWART, Judge.
The plaintiffs in this class action filed suit for damages and injunctive relief after their property located on and around Bayou D'Arbonne Lake flooded in 1991. The Bayou D'Arbonne Lake Watershed District, the Board of Commissioners of the Bayou D'Arbonne Lake Watershed District (the "Lake Commission"), and the State of Louisiana, through the Department of Transportation and Development ("DOTD") were all named as defendants. The trial court determined that the plaintiffs' action for damages had prescribed under La. R.S. 9:5624 and denied their claim for injunctive relief. Thereafter, the plaintiffs filed this appeal. We now affirm the trial court's judgment.

FACTS
The plaintiffs' class is comprised of 157 owners of homes and camps located in the vicinity of Bayou D'Arbonne Lake in Union Parish. Bayou D'Arbonne Lake (hereinafter referred to as "the lake") is a manmade lake created in conjunction with the damming of Bayou D'Arbonne and the building of a spillway. The dam and spillway project began in 1958 and was completed in 1963. It was conducted under the direction of the Bayou D'Arbonne Lake Watershed District, a political subdivision of the State of Louisiana governed by the Lake Commission. The lake reached its normal pool stage of 80 feet mean sea level ("80' MSL") in 1964. The Lake Commission purchased perpetual servitudes from the plaintiffs' ancestors in *115 title over all land below the 80' contour line of the lake.
The D'Arbonne dam is an earthen dam a quarter of a mile long with a 799 foot concrete spillway. The spillway is an "uncontrolled" spillway, meaning that there is no control over the amount of water that is discharged from the lake. The level of the lake fluctuates with the amount of rainfall in its watershed. The spillway was not designed for flood control purposes. It has four small gates, each five feet by five feet, which can be opened for lake management purposes. However, the gates provide no benefit for flood management purposes. In designing the lake, engineers calculated "design surcharges" which indicate how high the lake can be expected to rise during certain rain events. The design surcharges were calculated for 2-year, 5-year, 10-year, 25-year, and 100-year storms to be 84 feet, 85 feet, 85.6 feet, 86.2 feet, and 90 feet respectively. These calculations show, for instance, that a two year storm would produce a rise of four feet above the lake's normal pool stage of 80' MSL and that a 100 year storm would produce a rise of ten feet above the normal pool stage. All of the plaintiffs' homes and camps were built below the 100-year flood level.
Since the lake reached pool stage in 1964, the lake has risen above that level each year. Dates of significant high water readings include June 11, 1974 when the lake rose to 85.83 feet; February 5, 1975 when the lake rose to 84.60 feet; December 28, 1982 when the lake rose to 85.40 feet; and July 1, 1989 when the lake rose to 84.90. In the years prior to the 1991 flood, persons living in the lake area complained about damages caused by high water flooding as indicated by various documents submitted into evidence.
This evidence indicates that as early as 1979 there were complaints from property owners along the lake. A letter dated March 26, 1979 from the Lake Commission to state government officials refers to numerous calls from people who constructed improvements too close to the 80' contour line of the lake and refers to the need to clean up debris which accumulated along the shoreline as a result of high water. A response from DOTD on April 30, 1979 states that clean up of debris would be limited to public property, that it would not be feasible to make improvements to reduce the lake's flooding, and that landowners around the lake failed to heed advice not to construct in the surcharge area of the lake. Additionally, a Lake Commission letter dated August 12, 1980 refers to the thousands of dollars in damages caused to permanent residences, camps, docks, boat houses, piers, and, other improvements bordering the lake and states that property owners are discouraged by the "continual expensive maintenance caused by periodic high water...." This same letter also refers to a suggestion made by a property owner as to how to best handle the high water during the rainy season so as to provide relief. In 1986, the Union Parish Police Jury prepared a resolution addressed to DOTD requesting a study of whether the spillway gates could be used to regulate the lake level during periods of excessive rain. This resolution refers to difficulties experienced by families in accessing their homes. A Lake Commission letter dated July 6, 1989 again referred to high water causing substantial damage to docks, seawalls, and boat houses. Then, in 1990, a property owner suggested converting the spillway to a hydraulic system in an effort to alleviate damages caused by high water. The property owner's presentation to the Lake Commission referred to roads becoming flooded when the lake reaches 82.5 feet and impairing homeowners access to their homes and services. Reference is also made to damage to boat docks, piers, and homes caused by high waves.
In response to the ongoing complaints and flooding problems, DOTD determined that the cost of expanding the spillway to significantly reduce the lake's surcharge would be $35,000,000. It was also determined *116 that opening the spillway gates would provide no significant reduction in the high water levels of the lake due to the fact that the gates would provide only an additional 100 square foot area of discharge in comparison to the 4,000 square foot discharge capacity over the spillway.
The flooding from which this suit arises occurred in 1991 when the water level of the lake rose 4.27 feet after thirty percent of the yearly rainfall total fell over the lake area during a thirteen hour period on April 28 and April 29 of 1991. According to Edward R. Duranczyk, Jr., a meteorologist who testified as an expert on the defendants' behalf, the rainfall resulted from a train echo effect. Duranczyk explained that a train echo effect is a series of thunderstorms which occur continuously over an area during a short period of time. The train echo effect is an extremely rare meteorological event which cannot be predicted until it is already underway. Durancyzk described the rainfall as a 400-year event that will probably not occur again in the D'Arbonne area over a lifetime. Prior to this rain event, up to fifteen inches of rain, or just under four times the average rainfall for April, had fallen in the area of the lake from April 1 to April 25, 1991. The train echo effect resulted in an additional 12 to 14 inches of rain over the lake's basin. The April 1991 storm is now the "storm of record" against which other area rainfall is measured.
An expert in hydraulic engineering, Dr. Chester Watson, testified that the high water level of the lake peaked on April 30, 1991, and that the lake levels were the highest recorded. Watson explained that the flooding resulted not only from the record rainfall, but also from the damming effect caused by the Ouachita River which also experienced record highs and which backed up into Bayou D'Arbonne and consequently into the lake. According to Watson's analysis of the flood event, the high water level was higher than 90' MSL, the 100-year storm surcharge, all around the lake.
In the instant suit, the plaintiffs asserted claims of negligence based primarily upon the failure of the defendants to warn of the danger and extent of flooding associated with the lake. The plaintiffs also asserted a claim for injunctive relief based on the alleged violation of a natural servitude of drain whenever the lake rises above 80' MSL, the limit of the servitudes purchased by the defendants from the plaintiffs' ancestors in title. Recognizing the hardships that would arise from injunctive relief, the plaintiffs instead requested an award of damages in lieu of an injunction.
The trial court rejected the plaintiffs' negligence claims as well as their claim for injunctive relief. First, the trial court applied La. R.S. 9:5624 and determined that the plaintiffs' claims for damages prescribed. This determination was based upon a finding that flooding above 80' MSL and damages were common occurrences during the twenty years prior to the 1991 flood. Next, the trial court's denial of injunctive relief was based upon findings that the plaintiffs, pursuant to their deeds, consented to the alteration of the natural drain and that they should have known that the dam and spillway were not flood control structures. The trial court also found that the rain event which resulted in the flooding was an act of God and not an event that would subject the defendants to an injunction or liability for damages.

DISCUSSION

Prescription
The plaintiffs first assert that the trial court erred in finding that their action for damages prescribed. The two arguments raised by the plaintiffs are that the trial court did not consider their claim that the defendants were negligent in failing to warn of the danger of flooding and that La. R.S. 9:5624 does not apply to bar a claim for damages to homes that did not exist at the time of the completion of the *117 dam and spillway project because damage to such homes cannot be considered a necessary consequence of the construction of the dam and spillway.
In finding that the plaintiffs' claim for damages prescribed, the trial court applied the pre-1987 version of La. R.S. 9:5624 which provides:
When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run when the damages are sustained.[1]
This statute serves to limit the exposure of the state and its political subdivisions by requiring that "any and all actions" be brought within two years after damages are sustained. Lyman v. Town of Sunset, 500 So.2d 390 (La.1987); Nuckolls v. Louisiana State Highway Dept., 337 So.2d 313 (La.App. 2 nd Cir.1976), overruled in part by Gaharan v. State, Through Dept. of Transportation and Development, 579 So.2d 420 (La.1991). The language of the statute construed in light of its purpose precludes bringing any suit for damages after two years from the first occurrence of any damage upon completion of the public work. Nuckolls, supra. See also Wilson v. City of Baton Rouge, 96-0015 (La.App. 1st Cir. 11/8/96), 683 So.2d 382, writ denied, 96-2936 (La.1/31/97), 687 So.2d 408. However, the prescriptive period of R.S. 9:5624 does not apply when the act which caused the damages was not a necessary consequence or result of the public construction project. Roberts v. Murphy Oil Corp., 577 So.2d 308 (La.App. 4 th Cir.1991), writ denied, 580 So.2d 670 (La.1991).
There is no dispute that the construction of the dam and spillway and creation of the lake were public purpose projects. Since the lake reached pool stage, flooding above 80' MSL has occurred on a yearly basis. The spillway was not designed as a flood control device and cannot be used as such. Rather, the level of the lake fluctuates with the amount of rainfall in the watershed and flooding occurs. In designing the lake, surcharge calculations were made to determine how high the lake could be expected to rise during certain rain events. Thus, flooding above pool stage was clearly expected and did in fact occur on a regular basis as a consequence of the design of the lake and construction of the uncontrolled spillway.
Although the plaintiffs base their claim for damages on the failure to warn theory, the damages allegedly sustained by the plaintiffs resulted from flooding. Evidence indicates significant complaints beginning in 1979 and 1980 regarding damages to property, including permanent residences, camps, boat houses, and other improvements in the area of the lake, caused by flooding. The fact that the plaintiffs' homes were not yet built at the time the dam and spillway project was completed does not preclude application of the prescriptive period to bar their claim for damages filed over ten years after damages to private property, including improvements built in the area of the lake, became apparent. The plaintiffs no doubt chose to build in the lake area in order to enjoy the lifestyle, scenery, and recreational pursuits afforded by lake living. Just as the dangers of hurricanes are apparent to persons who choose to build improvements on the coastline of the Gulf of Mexico, the dangers of potential flooding should likewise be apparent to persons who choose to build improvements along a *118 lake, particularly one created in part by an uncontrolled spillway.
The flood damages sustained by the plaintiffs in 1991 and those damages sustained in the years since completion of the dam and spillway project are necessary consequences of the design and construction of the dam and spillway. Because the flooding of the lake area and the resulting damages to private property and improvements became apparent as early as 1980, we find no error in the trial court's application of La. R.S. 9:5624 to find the plaintiffs' claim for damages prescribed.[2]

Injunctive Relief
The plaintiffs assert that they are entitled to injunctive relief, or damages in lieu of injunctive relief, because any rise in the level of the lake above the 80' MSL contour line is an interference with their natural servitude of drain. The parties stipulated that prior to construction of the dam and spillway, the plaintiffs' property drained naturally into Bayou D'Arbonne. After construction of the dam and spillway, the plaintiffs' property drained into the lake. When the dam and spillway were constructed, the Lake Commission purchased perpetual servitudes from the plaintiffs' ancestors in title over property lying below the 80' MSL contour line of the lake. The written agreement which is included in each of the plaintiffs' chain of title provides, in part:
The parties hereto take cognizance of the fact that the Louisiana Legislature by Act No. 9 of 1956 has created a Watershed District out of Bayou D'Arbonne, Bayou Corney, Bayou Little D'Arbonne, Bayou Middle Fork, and the watershed of each one of the said streams and has made an appropriation to the Department of Public Works, State of Louisiana, to construct a dam and spillway on Bayou D'Arbonne for the purpose of impounding the waters of the said streams and of creating a recreational facility and water conservation reservoir, and it is understood by and between the parties hereto that by virtue of the servitude herein granted the said Board of Commissioners for the Bayou D'Arbonne Lake Watershed District, its successors, assigns, contractors, agents, servants and workmen shall have and enjoy the right at any time and for all time hereafter to inundate all or any part of the above described property with the waters of the said streams as it shall see fit, and to use and administer the same as a recreation and water conservation facility as contemplated by said Act No. 9 of 1956.
A natural servitude of drain is owed by an estate situated below to receive the surface waters that naturally flow from an estate situated above. La. C.C. art. 655. The owner of the servient estate may not do anything to prevent the flow of water. La. C.C. art. 656. Injunctive relief is available to the owner of the dominant estate to require the owner of the servient to remove obstacles which interfere with the natural drainage. Gaharan v. State, Through Dept. of Transportation and Development, supra. Because injunctive relief is a distinctly different form of relief than that afforded for damages to private property for public purposes, the prescriptive period provided in La. R.S. 9:5624 does not bar plaintiffs' claim for injunctive relief. Gaharan, supra. Furthermore, while injunctive relief is the preferred remedy for the owner of a servient estate which is owed a servitude of drain, exceptional circumstances may make granting of injunctive relief inappropriate or impermissible. In such cases, an alternative remedy, such as compensatory damages, may be available.
Gaharan, supra; Freestate Indus. Development Co. v. T. & H., Inc., 188 So.2d 746 (La.App. 2nd Cir.1966).
*119 However, both legal and natural servitudes may be altered by agreement if the public interest is not affected adversely. La. C.C. art. 730. Such agreements must be in writing and of record to bind subsequent property owners. O'Neill v. Miramon, 477 F.Supp. 82 (E.D.La.1979); Cornett v. Hebert, 31 So.2d 446 (La.App. 1st Cir.1947).
Our reading of the servitude agreement included in each of the plaintiffs' chain of title convinces us that the plaintiffs' ancestors in title agreed to and acquiesced in an alteration in the natural servitude of drain existing prior to the creation of the lake and construction of the dam and spillway. As expressed in the servitude agreement, the dam and spillway were to be constructed on Bayou D'Arbonne to impound the waters for the purpose of creating the lake. As a result of this action, no longer would the property now owned by the plaintiffs drain naturally into Bayou D'Arbonne; rather, the property would drain into Bayou D'Arbonne Lake created by the dam and spillway and subject to no flood control devices. Construction of the dam and spillway were the actions which resulted in the change in the natural drainage of the area surrounding the lake, and the construction project was clearly set forth in the servitude agreements. Dr. Chester Watson explained that construction of the dam changed the natural drainage of Bayou D'Arbonne by impounding the water and slowing it down in order to create a reservoir, the lake, for public use. Simply because servitudes were purchased only up to the 80' MSL contour line does not establish a violation of the natural drainage when the lake level rises naturally, through no action or fault on the part of the defendants, to higher levels. For these reasons, we find, as did the trial court, that the plaintiffs failed to prove their entitlement to injunctive relief.
Our affirmance of the trial court's ruling is buttressed by the severity of the storms and flooding in 1991 which led to the filing of this suit. The testimony of Edward R. Duranczyk, Jr., established the rarity and severity of the storm system which preceded and produced the flooding. Dr. Chester Watson's testimony, as well as exhibits entered into evidence, established that flooding was widespread and not limited only to the area of the lake. High water existed not only in the area of the lake, but also along Bayou D'Arbonne and the Ouachita River and its tributaries. Twentyone new maximum record stages were set along the Ouachita River. According to the 1993 Flood Hazard Evaluation by the Corps of Engineers, approximately 1,555,000 acres were flooded by the 1991 event. Perhaps the most relevant consideration to the plaintiffs' claim is that, according to Dr. Watson, the peak on April 30, 1991, produced flooding all around the lake above 90' MSL, the surcharge level predicted for a 100 year storm. Furthermore, Dr. Watson's studies indicated that flooding above 80' MSL, and above 90' MSL in at least one area of the lake, would have resulted even in the absence of the dam.
The term "act of God" or, in civilian parlance, force majeure is defined as
a providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence, and care or by the use of those means which the situation renders reasonable to employ.
Saden v. Kirby, 94-0854 and 94-0926 (La.9/5/95), 660 So.2d 423; Southern Air Transport v. Gulf Airways, 215 La. 366, 40 So.2d 787 (1949); Caldwell v. Let The Good Times Roll Festival, 30,800 (La.App. 2nd Cir. 8/25/98), 717 So.2d 1263, writ denied, 98-2489 (La.11/25/98), 729 So.2d 566. The trial court determined that the extraordinary rainfall which resulted in the flooding was an Act of God. In light of the considerations discussed above, we find no error in this determination.

*120 CONCLUSION
For the reasons discussed, we affirm the judgment of the trial court denying the plaintiffs' claim for damages and request for injunctive relief or damages in lieu of such relief. Costs of this appeal are assessed to the plaintiffs.
AFFIRMED.
NOTES
[1] Although La. R.S. 9:5624 was amended by No. 339 of Acts 1987 to provide that prescription begins to run after completion and acceptance of the public work, it has been held that the amended version shall not apply retroactively to deprive a party of vested prescriptive rights. See Small v. Avoyelles Parish Police Jury, 589 So.2d 1132 (La.App. 3rd Cir.1991), writ denied, 593 So.2d 373 (La.1992); Lyman v. Town of Sunset, 567 So.2d 1171 (La.App. 3 rd Cir.1990), writ denied, 571 So.2d 648 (La. 1990); LeBlanc v. City of Lafayette, 558 So.2d 259 (La.App. 3rd Cir.1990). As will be discussed infra, the trial court was correct in applying the pre-1987 version of R.S. 9:5624 to the plaintiffs' claim for damages.
[2] In making this finding, we follow the First Circuit in interpreting R.S. 9:5624 as precluding claims for all damages, special and general, arising from damage to private property for public purposes. See Wilson v. City of Baton Rouge, supra.