660 So.2d 423 (1995)
Charles SADEN, et al.
v.
Michael E. KIRBY, et al.
Nos. 94-C-0854, 94-C-0926.
Supreme Court of Louisiana.
September 5, 1995.
Rehearing Denied October 13, 1995.
*424 Jack P. Brook, Sandra A. Vujnovich, Michael A. Stroud, Kenneth A. Goodwin, Jan T. van Loon, Brook, Morial, Cassibry, Pizza, Adcock & van Loon, New Orleans, for applicant (94-C-0926).
Marsha M. McKendall, Baton Rouge, Terrel J. Broussard, Sidney H. Cates, John D. Lambert, Jr., Carter & Cates, New Orleans; Frank J. Uddo, Basile J. Uddo, Uddo & Milazzo, Metairie; Wade D. Rankin, Schafer & Schafer, New Orleans; Joseph L. Kreller, Jr., Gretna, William A. Stark, Houma, Gustave A. Fritchie, Slidell, for respondent.
Wade D. Rankin, New Orleans, for Lexington Insurance Co. (amicus curiae).
LEMMON, Justice.[*]
In this class action, residents and property owners of an area known as the Lower Coast of Algiers are seeking to recover their damages sustained when heavy rains flooded the area. The defendants are the New Orleans Sewerage & Water Board (S & WB), who allegedly was responsible for additional flooding and a prolonged period of flooding because of its negligence in failing to repair timely one of its pumps that was inoperative during the storm, and the Plaquemines Parish Government (PPG), who allegedly was responsible for additional flooding and a prolonged period of flooding because of the erection of an emergency dam designed to prevent floodwaters from flowing into Plaquemines Parish from Orleans Parish through a gap in the levee along the parish line. On certiorari to this court after an adverse judgment on the merits, the S & WB and the PPG raised substantial issues of liability and causation.

Facts
The Lower Coast of Algiers is part of a peninsula formed in Orleans and Plaquemines Parishes by a crescent-shaped curve of the Mississippi River. The sparsely populated part of the peninsula situated in Orleans Parish is called the Lower Coast of Algiers.
The peninsula is an area of low lands surrounded on three sides by the Mississippi River and on the other side by the Intracoastal Waterway. The Donner Canal divides the peninsula roughly in half along the border between Plaquemines and Orleans Parishes, as shown on the following plat which has been annotated by this court:
*425 
*426 The Donner Canal was constructed in the 1930s to provide drainage of the peninsula into the Algiers Outfall Canal. In the 1950s, the U.S. Army Corps of Engineers constructed the Intracoastal Waterway with levees that disrupted the natural drainage of the Lower Coast of Algiers and, combined with the levees of the Mississippi River, created a bowl-like effect. Drainage Pumping Station No. 11 (DPS 11) was therefore built at the foot of the Donner Canal to receive water from the Donner Canal and the lateral canals in the Lower Coast, and to lift the water across the levee into the Intracoastal Waterway.
In the 1970s, the Orleans Parish Levee Board completely rebuilt the Donner Canal, raising the levee along the canal to a height of twenty-five feet Cairo Datum.[1] The canal and levee were entirely in Orleans Parish, but the levee was on the Plaquemines Parish side of the canal. Hence, the Donner Canal levee cut off the flow of water between the Lower Coast of Algiers and the Plaquemines Parish portion of the peninsula, except for two large culverts in the levee and for Louisiana Highway 406, a ground level crossing through the levee.[2]
The elevations on the peninsula were highest along the Mississippi River, and the lands gradually sloped from the River on the north, east and south toward the center of the peninsula where the Donner Canal was located. The lowest elevations in the Lower Coast were in the western section of the peninsula in the area of DPS 11.
At the time of the flooding, the S & WB maintained and operated DPS 11 under a contract with the U.S. Army Corps of Engineers, who had designed and built the station. There were two large pumps and a smaller constant duty pump at the station. The large pumps, Pump A and Pump B, each had a nameplate capacity of 250 cubic feet of water per second, while the smaller constant duty pump, which was designed to handle normal rainfall, had a thirty-cubic-feet-per-second capacity.
The S & WB supplied power from its generating plant to DPS 11 with a sixty-hertz overhead line for the constant duty pump and a single twenty-five-hertz underground feeder line for both Pumps A and B. DPS 11 was also equipped with one diesel generator, capable of supplying emergency power to either Pump A or Pump B, but not both at the same time.
The rain began in the evening of April 6, 1983. The period of heaviest rainfall was between 12:30 a.m. and 6:30 a.m. on April 7. During the twenty-four-hour period beginning shortly after midnight on April 7, ten to twelve inches of rain fell on the Lower Coast.
At 3:07 a.m. on April 7, the S & WB began operating Pump A when the water level at the station reached the point at which the large pumps were designed to operate.[3] Inasmuch as the feeder line that supplies the power to the two large pumps was out of service, having been inoperative for almost three months because of a fault in the system, Pump A was operated with power from the emergency generator. The S & WB was unable to use Pump B at any time during the emergency.
PPG officials monitored the rising water level during the day of April 7 at the Highway 406 gap in the levee. When the PPG officials decided to build a temporary structure across the gap in the levee in order to block the flow of the floodwaters into Plaquemines Parish, workers began filling the *427 ditches with sandbags and sacks of earth about 3:30 p.m. Five truckloads of shells were delivered to the site, and bulldozers built a shell dam or ramp across the highway. The ramp, about eighteen inches high, was completed around 5:15 p.m.
Numerous persons whose properties in the Lower Coast were damaged by the floodwaters filed this class action against the S & WB and the PPG.[4] Although conceding that much of the flooding in Orleans Parish would have occurred despite the unavailability of Pump B and the erection of the temporary structure across the levee gap, plaintiffs sought to recover the damages they incurred because of the additional and prolonged flooding allegedly caused by the intentional conduct of the PPG and by the negligent conduct of the S & WB.
Following the first phase of a bifurcated trial on the issue of liability, the trial judge found that the PPG was liable for its intentional blockage of the gap in the levee and that the S & WB was liable for its negligence in failing to repair timely the feeder line necessary to operate the second large pump. The trial court concluded that although an act of God caused the overall flood, each defendant was responsible for causing at least two and one-half inches of additional flooding and for causing a longer duration of flooding.
The court of appeal affirmed. 93-0735, 93-1013 (La.App. 4 Cir. 3/15/94); 635 So.2d 277. The court concluded there was sufficient support in the record for the trial court's determination that defendants caused at least five inches of additional flooding. The court further concluded that the PPG was not liable for the commission of an intentional tort because the officials believed the Lower Coast was already flooded and did not "intend" to cause additional flooding there. Nevertheless, the court held the PPG was liable for damages to plaintiffs' properties because of its breach of La.Civ.Code art. 667's obligations of vicinage.
This court granted certiorari to review the rulings of the lower courts. 94-0854, 94-0926 (La. 7/5/94); 639 So.2d 1184.

Liability of the Sewerage and Water Board
The lower courts ruled that the S & WB was negligent in failing to repair timely the fault in the feeder line supplying power to the two large pumps when the feeder line had been inoperative for three months at the time of the flood. The lower courts further ruled that the S & WB's inability to use Pump B because of the negligent failure to repair the fault was a cause-in-fact of those damages sustained by plaintiff as a result of additional flooding and of the prolonged presence of the floodwaters. The S & WB challenged these rulings on both negligence and causation.
Under the duty-risk approach to determining tort liability, the court first determines whether the defendant's conduct was a cause-in-fact of the plaintiff's damages. Fowler v. Roberts, 556 So.2d 1 (La.1989); Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970). This determination is usually a "but for" inquiry that tests whether the damages would not have occurred but for the defendant's conduct. The "substantial factor" inquiry is also useful to determine cause-in-fact when the conduct of each of two or more persons actually contributes to the plaintiff's harm even though the harm would have occurred without the interaction of one. Lombard v. Sewerage & Water Bd. of N.O., 284 So.2d 905, 913 (La.1973); William L. Crowe, Sr., The Anatomy of a Tort, 22 Loy L.Rev. 903, 904-05 (1976).
In the present case, the S & WB contends that any negligence on its part was not a cause-in-fact of plaintiffs' damages because the Lower Coast would have flooded even if Pump B had been fully operational. The S & WB argues that the heavy rains which in fact caused the damages were a force majeure which it did not cause and could not have prevented.
*428 The term "force majeure" means a superior or irresistible force. Black's Law Dictionary 645 (6th ed. 1990). The concept of "force majeure" is similar to the common law concept of "act of God," which has been defined as a "providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care, or by the use of those means which the situation renders reasonable to employ." Southern Air Transp. v. Gulf Airways, 215 La. 366, 375, 40 So.2d 787, 791 (1949).
When a "force majeure" or "act of God" combines or concurs with the conduct of a defendant to produce an injury, the defendant may be held liable for any damages that would not have occurred but for its own conduct or omission. Brantley v. Tremont & Gulf Ry., 226 La. 176, 75 So.2d 236 (1954). There can be, and frequently is, more than one cause of a particular injury. A party's conduct is a cause-in-fact of harm to another whenever it is a "substantial factor" in bringing about that harm. Lombard v. Sewerage & Water Bd. of N.O., 284 So.2d 905, 913 (La.1973); Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (1962).
Michael Ports, an expert in civil engineering, hydraulics and hydrology, explained that the rate of arrival of water at the pumping station was far in excess of the maximum pumping capacity of the drainage station, even if both large pumps and the constant duty pump had been in operation. Ports therefore concluded that the flooding still would have occurred even if Pump B had been operational during the storm.
On the other hand, Jerome Pepper, an expert in land surveying and civil engineering, concluded that the failure of Pump B at DPS 11, while not being the major cause of the flooding, contributed (along with the PPG's blockage of the gap in the levee) to the rapid rise in the surface elevation of the floodwaters and to the prolonged duration of the flooding. With respect to the failure of Pump B at DPS 11, Pepper concluded that an additional 5.6 inches of water would have been pumped out of the Lower Coast and into the Intracoastal Waterway if Pump B been operational during the flooding.
Dr. Steve McCutcheon testified as an expert in civil engineering, hydrology, and hydraulic engineering. Dr. McCutcheon opined that the failure of Pump B at DPS 11, combined with the shell dam at the Highway 406 crossing, resulted in a total of six inches of additional flooding to the Lower Coast. He calculated that the net effect of Pump B's failure was an approximate three-inch difference in the surface elevation of the floodwaters.
The trial judge noted that both Dr. McCutcheon and Ports provided impressive and credible testimony, but that "[w]here they differed was the acreage used in their figures." The judge credited Dr. McCutcheon's conclusions that the unavailability of Pump B caused a three-inch rise in the water surface elevation because Dr. McCutcheon limited his calculations to the lower areas of the Lower Coast where the water had "ponded," rather than using the entire 4,500 acres in the Lower Coast. The judge concluded that the S & WB's negligence, along with the PPG's building the shell dam, "concurred with the force majeure in the damage to plaintiffs by causing six additional inches of rain to enter their homes and creating a longer duration of flooding."[5]
The S & WB challenged Dr. McCutcheon's calculations pertaining to the amount of additional flooding caused by the S & WB's conduct. The canal and pumping system of the Lower Coast of Algiers drained approximately 4,500 acres. Dr. McCutcheon calculated the total amount of water that Pump B, if the pump had been operational, would have pumped out of the Lower Coast during the period between the time Pump A began operating and the time the floodwaters reached their peak. He then calculated that the highest surface elevation of the floodwaters would have been three inches lower if Pump B had been available. On cross-examination, he calculated that the total amount of water attributable to the absence of Pump B, if spread over the entire 4,500 acres, would *429 have caused only a one-inch rise in the surface elevation of the floodwaters. He pointed out, however, that this amount of water actually caused a difference of three inches in surface elevation of the floodwaters, explaining that he confined his calculations primarily to the "ponded area," which was the lower area into which the drainage canals transported the rain water. In his calculations he also took into account the backwater effect that extends back into the drainage canals and keeps the surface elevation higher because of the water's inability to "pond up" immediately in the lowest position. Because of the backwater effect and the mounding effect of water building up as it moves down to the lower levels, Dr. McCutcheon explained, the flooding is not limited to the elevations below the elevation of the ponded water surface.
We cannot say that the trial judge erred manifestly in accepting Dr. McCutcheon's opinion evidence over other credible expert testimony. Dr. McCutcheon's testimony provided sufficient support for the trial judge's conclusion that if all three pumps at DPS 11 had been operating, the surface elevation of the floodwaters at their highest point would have been two and one-half inches lower. Conversely, the S & WB's failure to maintain properly the feeder line necessary to keep both large pumps operational caused two and one-half inches of additional flooding and a prolonged period of flooding in the Lower Coast of Algiers. We conclude that the lower courts correctly ruled that the S & WB's pumps' operating only at slightly above one-half capacity was a cause-in-fact of the damages resulting from additional flooding and from the prolonged period of flooding.
The next inquiries are whether the S & WB had a duty to conform its conduct to a specific standard and whether the S & WB's conduct failed to conform to that standard.
In the present case, the S & WB clearly had a duty to maintain the DPS 11 pumps in a reasonable manner under the circumstances in order to prevent flooding. The principal issue is whether the S & WB breached that duty.
Several S & WB employees testified regarding the repair of the feeder line. The supervisor of drainage operations testified that a fault occurred on January 9, 1983 in the feeder line that supplied power to the two large pumps in DPS 11. He promptly reported the disabled feeder line to the supervisor of electrical maintenance and to the superintendent, who immediately issued a repair order. According to the supervisor, efforts to locate the fault with fault locators and other equipment began the same day, but the efforts were hampered because the feeder line passed through several miles of woods and swamps. The fact that they discovered more than one fault further complicated the repair efforts, since only one fault can be located at a time. Several periods of rainy weather also impeded efforts to locate the faults. Despite these problems, the feeder line was placed back in service in July, 1983, six months after the fault first developed and three months after the flooding at issue in this litigation.
James Tudor, an expert in electrical engineering and in the design of electrical systems, testified that locating a problem such as the breakdown or fault in DPS 11's underground feeder line should take only a few hours and that repairing the fault, once located, should normally take less than a day. While Tudor admitted that the length of time necessary for location and repair of the fault could be affected somewhat by the terrain, he opined that the repair of a fault in an underground system should take less than a week, even in a swampy area such as the Lower Coast of Algiers. Pump B could have been utilized during the flooding, according to Tudor, either if the fault in the underground system had been repaired timely or if there had been two separate underground lines as there were in the other S & WB systems.[6]
*430 The breach of duty issue boils down to a credibility choice between two reasonable versions of the repair efforts. The S & WB asserted that it took six months of prompt and diligent efforts to locate and repair the fault or faults in the feeder line. Tudor asserted that this amount of time to locate and repair faults was totally unreasonable, regardless of the terrain in which the feeder line was located. The trial judge resolved the conflicting testimony in favor of plaintiffs, noting that the S & WB had "no reasonable excuse to allow one-half of the pumping capacity of DPS # 11 to be idle for three months in an area subject to heavy rainfall."
We agree with the court of appeal that the factfinder's reasoned choice between two credible versions was not manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La. 1989). The primary purpose of the large pumps was to handle the water generated by greater than normal rainfall, and a period of six months to locate and repair problems in the large pumps' only power source was almost facially unreasonable, especially since this was the rainy season in an area of heavy rainfall that was located partially below sea level and since there was only one back-up generator. We cannot say that the trial judge's rejection of the S & WB's excuses was clearly wrong or that he erred manifestly in ruling that the S & WB breached its duty to maintain the pumps properly.
There is no dispute as to the scope of duty issue, since the duty breached by the S & WB clearly encompassed the damages sustained by plaintiffs. The damages issue has not yet been tried.
We therefore affirm the lower courts' judgments that the S & WB was liable for plaintiff's damages caused by the additional and prolonged flooding.

Liability of the Plaquemines Parish Government
The PPG contends that its building the shell dam across Highway 406 and sandbagging the swales was not a cause-in-fact of any additional flooding in the Lower Coast of Algiers. The PPG points out that the floodwaters at the suction basin of DPS 11 reached 20.0 feet Cairo Datum at 3:30 p.m. on April 7, before the PPG began construction of the shell dam, and that the highest level reached by the floodwaters in the suction basin during the entire period of flooding was 20.0 Cairo Datum.[7] Accordingly, the PPG argues, the shell dam could not have caused additional flooding since no additional flooding occurred after it was built.
The rain began at about 8:00 p.m. on April 6, but fell only in modest amounts until intense rainfall began shortly after midnight.[8] The most intense rain was between 12:30 a.m. and 6:30 a.m. on April 7, when almost eight inches of rain fell. Rain again fell between 7:00 a.m. and 9:30 a.m. Although additional heavy rains had been predicted, there was no heavy rainfall after 10:00 a.m., but only drizzling rain.
The PPG officials first inspected the Highway 406 gap in the Donner Canal levee about 8:00 a.m. and monitored the rising water throughout the day. About 3:00 p.m., when the water on the highway was over one foot deep and additional heavy rains were predicted, the PPG officials issued an order to place sandbags in the swales and to build the *431 shell dam. Work began about 3:30 p.m., and the dam was completed about 5:15 p.m. The predicted additional heavy rainfall never occurred, and the shell dam was removed early the next morning.
The evidence that the level of floodwaters at the suction basin of DPS 11 never went above the level reached at 3:30 p.m. on April 7 raises the inference that the floodwaters in the Lower Coast peaked at 3:30 p.m., before the shell dam was built. In order to overcome this inference, plaintiffs presented the testimony of Dr. Steve McCutcheon that the floodwaters continued rising until 6:30 p.m. that evening.[9] Dr. McCutcheon attempted to attribute continued rising of the floodwaters in the Lower Coast after 3:30 p.m. to lag time caused by the backwater effect and the mounding effect of the floodwaters, which kept the waters from ponding up immediately in the lowest position in the area where DPS 11 was located. However, even accepting Dr. McCutcheon's testimony that the backwater and mounding effect caused a lag time of several hours after the rain stopped for the water to reach the ponded area from the uppermost part of the basin, one must conclude that the levels in the lowest portion would have increased as the waters reached DPS 11. As a matter of fact, the level in the suction basin at DPS 11 never increased after 3:30 p.m. This fact suggests that the lag time caused by the backwater and mounding effect elapsed before 3:30 p.m., a suggestion that is strengthened by the fact that no significant amount of rain necessary to produce further backwater and mounding effect fell after 10:00 a.m. In any event, there is simply no evidentiary basis in the record to support Dr. McCutcheon's conclusion that the time of the peak floodwaters in the Lower Coast of Algiers on April 7 was 6:30 p.m. (or 8:30 p.m.).
The trial court implicitly found that the PPG's construction of the shell dam was a cause-in-fact of two and one-half inches of additional flooding in the Lower Coast, but did not address in the reasons for judgment the PPG's evidence that the surface level of the floodwaters peaked before the dam was built. The court of appeal affirmed this cause-in-fact finding on the basis of absence of manifest error.
The cause-in-fact issue as to the PPG's conduct involves the question of the sufficiency of the evidence that a rise in the surface level of the floodwaters occurred after the shell dam was constructed. Even viewing the record facts in the light most favorable to the prevailing party in the trial court, we conclude there was insufficient evidentiary support for the trial court's determination that the surface level of the floodwaters rose after the PPG constructed the shell dam. The stipulations and other evidence clearly preponderated over Dr. McCutcheon's unsupported opinion that the surface level of the floodwaters continued to rise after 3:30 p.m. on April 7.
We therefore conclude that the PPG's construction of the shell dam after 3:30 p.m. on April 7 did not cause additional flooding in the Lower Coast of Algiers, and thus did not cause any damage to plaintiff because of additional flooding.

Decree
For the foregoing reasons, the judgments of the lower courts against the Plaquemines Parish Government are reversed, and plaintiffs' claims against that defendant are dismissed. The judgments of the lower courts against the New Orleans Sewerage and Water Board on the issue of liability are affirmed. The case is remanded to the district court for trial on damages.
KIMBALL, J., not on panel. Rule IV, Part 2, § 3.
NOTES
[*] Justice Pike Hall, Jr., retired, participating in the decision by assignment, the case having been argued prior to his retirement. Judge Felicia Toney Williams, Court of Appeal, Second Circuit participating as Associate Justice Pro Tempore, effective September 1, 1994.
[1] "Cairo Datum" is an artificial measuring system which is frequently employed by surveyors in low-lying areas where the contours of the land run both above and below sea level.
[2] The original plans for the reconstruction of the Donner levee called for Highway 406 to pass over the levee. Apparently for economic reasons, however, the Orleans Parish Levee Board constructed the levee with the Highway 406 crossing at ground level, leaving a gap in the levee system.
[3] Michael Ports, an expert in civil engineering, hydraulics and hydrology, testified that the pumping station was designed to keep the water level in the canals at eleven feet Cairo Datum. If the water level falls below a certain point, Ports explained, slough and mud from the canal will fall into the drainage ditches and block the canal. Therefore, even though the National Weather Service predicted the April 7 storm and possible flooding several days in advance, the S & WB could not have turned on the large pumps any earlier.
[4] The plaintiffs also sued the Orleans Parish Levee District, alleging that it was negligent in the construction of the Donner Canal and its levee, and the Louisiana Department of Transportation and Development (DOTD), who gave the PPG permission to block the highway on the condition that the road remain passable and well lighted. The plaintiffs settled with the Levee District prior to trial, and the trial court found that the DOTD was not liable for any damages.
[5] In amended reasons, the judge used the figure of five inches.
[6] Tudor stated that there should have been at least two underground electrical feeder lines to the pumping station, plus a back-up diesel generator for each of the large pumps. Tudor further testified that Pump B could have been operated during the flooding event by use of the sixty-hertz overhead line if the pumping station had been equipped with a frequency converter. The S & WB contends that installation of additional electrical feeder lines, back-up generators or frequency converters fell under the category of discretionary functions for which governmental bodies are immune from liability. Because the record supports a finding of negligent failure to repair the fault timely, we do not reach the additional equipment argument by plaintiffs or the discretionary function defense by the S & WB.
[7] The parties stipulated at trial to the following:

1. The daily log at DPS 11 indicated that the height of the water in the suction basin at 3:30 p.m. on April 7, 1983 was 20.0 Cairo Datum.
2. The daily log at DPS 11 indicated that the height of the water in the suction basin remained at 20.0 Cairo Datum from 3:30 p.m. on April 7, 1983 until 8:00 a.m. on April 8, 1983.
3. The daily log at DPS 11 indicated that the highest level the water reached in the suction basin between 1:00 a.m. on April 7 and midnight on April 8, 1983 was 20.0 Cairo Datum.
[8] Although the rain gauge at DPS 11 did not operate accurately during this period of heavy rains, the experts who testified about the amount of rainfall used rain data from DPS 13, which was near the Lower Coast.
[9] Dr. McCutcheon apparently calculated the time of the peak water surface originally as 8:30 p.m., but an error of two hours was discovered during cross-examination.