759 So.2d 921 (2000)
Charles SADEN, et al.
v.
Michael E. KIRBY, et al.
No. 98-CA-1762.
Court of Appeal of Louisiana, Fourth Circuit.
April 5, 2000.
Writs Denied June 30, 2000.
*924 Frank J. Uddo, Basile J. Uddo, Joseph L. Kreller, Jr., Marilyn B. Landry, Metairie, LA, Counsel for Plaintiffs/Appellees.
Wade D. Rankin, Schafer & Schafer, New Orleans, LA and Kenneth A. Goodwin, New Orleans, LA, Counsel for Defendant/Appellant.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES, Judge MIRIAM WALTZER, Judge MOON LANDRIEU and Judge JAMES F. McKAY, III).
PER CURIAM.
In this class action suit, defendant, Lexington Insurance Company, appeals from a trial court judgment rendered in favor of the plaintiffs following the damages phase of a bifurcated trial. Plaintiffs answer the appeal and seek additional damages.
The residents and property owners of the Lower Coast of Algiers filed this class action suit against the New Orleans Sewerage & Water Board (S&WB) and the Plaquemines Parish Government as well as the Orleans Levee District and the Louisiana Department of Transportation and Development (DOTD) for damages sustained by flooding on April 7, 1983. Prior to the liability phase of the trial, the plaintiffs settled with the Orleans Levee District. Following the trial, the trial court found no liability on DOTD's part and dismissed the claims against it. On appeal from the liability phase judgment, the Supreme Court dismissed the suit against the Plaquemines Parish Government but held the S&WB liable. The Court found the trial and appellate courts were correct in concluding that the S&WB was negligent for failing to timely repair an electrical feeder line which supplied power to two of three pumps at Drainage Pumping Station 11(DPS 11). The Court also upheld the lower courts' finding that the S&WB's failure to maintain three operational pumps during the heavy rain fall caused 2½ inches of additional floodwaters and prolonged the period of flooding in the Lower Coast of Algiers. Saden v. Kirby, 94-0854, 94-0926 (La.9/5/95), 660 So.2d 423. Notably, the Lower Coast of Algiers consists of approximately 4500 acres, yet the district court found, based on the testimony of plaintiffs' expert, Dr. Steve McCutcheon, that the additional flooding caused by the S&WB's negligence was restricted primarily to 1500 acres in the lowest area within the elevation contour of 20.0 foot CD[1] where the water had "ponded." Id. at 428.
Following the Supreme Court's decision, on January 22, 1996, the S&WB settled with plaintiffs for the amount comprised of its self-insured retention, $500,000, plus a *925 portion of the accrued interest. As part of the settlement agreement, the plaintiffs reserved their rights against the defendant, Lexington Insurance Company (Lexington), the S&WB's excess liability insurer.
In 1997, prior to the damages phase, the plaintiffs filed a Seventh Supplemental and Amending Petition, seeking to add all nonresident property owners in the Lower Coast of Algiers as class plaintiffs. The trial court recognized that those non-resident property owners who had real and personal property located within the class geographical boundaries should be included in the class.[2]
Following the trial but prior to rendering a final judgment, the trial court also restructured the class geographical boundary to include an additional 600 feet beyond the original geographic boundary to account for the damages caused by the floodwater's "backwater" and "mounding" effects. Shortly thereafter, on January 21, 1998, the trial judge conducted a site inspection at the Lower Coast of Algiers. Based on his observations, the trial judge found the residents and property owners in a small area adjacent to the 600 foot extension [referred to by the trial court in its reasons for judgment as the "border area"] had also sustained damages by the floodwaters. The trial court added those persons to the class.
The trial court rendered judgment in favor of the plaintiffs and against the defendant. The final award as set forth in the trial court's reasons for judgment is itemized as follows:

Structural Damages ($31,236 × 37 structures) $1,155,732.00
Mobile Homes ($5,000 × 12) 60,000.00
Personal Property ($6,962 × 50 house-holds) 348,100.00
Real Estate Devaluation ($539 × 3,952 lots) 2,130,128.00
Emotional/Psychological Suffering ($5000
× 170) 850,000.00
 _____________
TOTAL DAMAGES $4,543,960.00
Less S & WB's self-insured retention -500,000.00
 _____________
TOTAL AWARD $4,043,960.00

On appeal, defendant argues that the S&WB was not responsible for all damages in the Lower Coast of Algiers as a result of the April 1983 flood. It emphasizes that the Supreme Court in Saden v. Kirby, supra, recognized that a majority of damages within the area would have occurred even if all three pumps in DPS 11 had been operating, noting that such damages occurred in other areas of New Orleans where drainage pumps were working at full capacity. More specifically, defendant relies on the Supreme Court's holding that, "when a `force majeure' or `act of God' combines or concurs with the conduct of a defendant to produce an injury, the defendant may be held liable for any damages that would not have occurred but for its own conduct or omission." Saden v. Kirby, 660 So.2d at 428. (emphasis added). Citing this, defendant asserts the plaintiffs failed to satisfy their burden of proving those damages which were the result of the incremental increase in flood elevation and duration caused by the S&WB's negligence. In appealing the trial court's judgment, the defendant raises the following 15 assignments of error.
1. The trial court erred in admitting as an exhibit, excerpts of Dr. Steve McCutcheon's trial testimony given at the liability phase.
2. The trial court erred in expanding the area affected by the flooding.
3. The trial judge erred in expanding the class to include residents, houses, mobile homes and lots outside of the 20.0 CD contour.
4. The trial court erred in accepting the testimony of plaintiff's expert, Jerome Pepper, regarding the duration of the flooding.
5. The trial court erred in permitting Joseph Caulfield, plaintiffs expert, to give testimony beyond his expertise.
*926 6. The trial court erred in accepting Caulfield's testimony.
7. The trial court erred in not accepting defendant's witness, William Springer, as an expert in the field of flood damage assessment.
8. The trial court erred in not accepting as evidence questionnaires completed by residents of Lower Coast of Algiers, even though it accepted further evidence on issues to which the questionnaires would have been relevant.
9. The trial court erred in assessing unproven damages for the loss of mobile homes.
10. The trial court erred in awarding non-depreciated replacement values for the loss of personal property.
11. The trial court erred in awarding damages for loss of personal property without proof of connexity to the fault of the S&WB.
12. The trial court erred in not sustaining the defendant's exception of prescription with regard to the damages sustained by non-residents of the Lower Coast Algiers.
13. The trial court erred in awarding damages for real estate devaluation based upon improper calculation of property values.
14. The trial court erred in awarding damages for real estate devaluation in the absence of evidence suggesting any link between such a loss and the incremental increase in height and duration of flooding caused by the S&WB.
15. The trial court's award for emotional damages was excessive and not supported by the evidence.
Plaintiffs have answered the appeal, claiming that the S&WB is liable for the damages throughout the entire Lower Coast of Algiers because the adverse affects of the flood, particularly its prolongation, were sustained throughout the entire area. In their brief, plaintiffs raise four assignments of error:
1. The trial court erred in not applying the concept of concurrent causation.
2. The trial court erred in not including the entire area of Lower Coast of Algiers in redefining the class.
3. The trial court erred in the amount of emotional damages it awarded to class members.
4. The trial court erred in reversing its original award and removing the CPI adjustment.

STANDARD OF REVIEW
A trial court's factual findings will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Daye v. General Motors Corporation, 97-1653 (La.9/9/98), 720 So.2d 654, 658; Stobart v. State, Through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). Where two reasonable views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882-83. The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong, but whether the factfinder's conclusion was a reasonable one. Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, 1176.
Defendant's assignments of error 1-3 and plaintiffs' assignment of error 2 concern the trial court's determination of the area affected by the fault of the S&WB.
Defendant argues that the trial court erred in expanding the class geographical boundary 600 feet beyond the 20.0 foot CD contour to account for the damages resulting from the floodwater's backwater effect. Likewise, it argues the court erred in expanding the class to include the residents and property owners within the border area adjacent to the 600 foot extension. Defendant points out that, in the earlier liability phase, the trial court determined, relying on plaintiffs' expert's *927 testimony, that the additional 2½ inches of floodwaters attributed to the S&WB's negligence was strictly confined to the "ponded" area within the 20.0 foot CD contour, and this finding was upheld by the Supreme Court in Saden v. Kirby, supra. Defendant also takes issue with the trial court's allowing the plaintiffs to introduce Dr. McCutcheon's testimony from the earlier liability phase as proof of the floodwater's backwater effect.
Plaintiffs, on the other hand, contend that the trial court erred in not redefining the class to include all residents and property owners in Lower Coast Algiers where the court acknowledged that the inoperable pump at DPS 11 served the entire area. Nevertheless, they contend the trial court was correct in relying on the testimony of Dr. McCutcheon, their expert in hydraulic and civil engineering, from the liability phase where the district court clerk's office misplaced an exhibit [survey notes made by the Plaquemines Parish Government], which they intended to introduce into evidence.
At the outset, we cannot say that in the absence of the missing survey notes, the trial judge abused his discretion in allowing the plaintiffs to introduce Dr. McCutcheon's testimony from the liability phase. He testified as to the total amount of water Pump B would have pumped out of the Lower Coast of Algiers if it was operational during the period between the time Pump A began operating and when the floodwaters reached their peak. According to him, the highest surface elevation of the floodwaters would have been three inches lower if Pump B had been operable. In addition, he testified the backwater created a six inch "flood wave" extending beyond the ponded area and down the basin. On cross-examination, however, Dr. McCutcheon limited the backwater effect to continuously decreasing heights as it extended away from the ponded area.
Defendant readily admits that there was some backwater effect associated with the elevated floodwaters in April 1983. However, defendant's expert in hydraulics, Michael Ports, testified there was a distinction between the backwater effect caused naturally by the flood, such as backwater caused by obstructions and debris in a lateral drainage canal, and that attributable to the S&WB's negligence. Ports explained that the ponded area completely covered the Norman Canal and nearly all of the Donner Canal except for a small portion near the Coast Guard Station. This being the case, he agreed with Dr. McCutcheon that the backwater's effect lessened and dissipated the farther the distance the water flowed from the ponded area.
In expanding the class geographical boundary, the trial judge relied heavily on Dr. McCutcheon's testimony from the earlier trial. In his reasons for judgment he stated:
The Court believes that a surer way to determine what buildings could be identified as damaged by the pond caused backwater would be to accept the six inch wave theory of Dr. McCutcheon and apply it to any building in the immediate vicinity of the ponded area which contained floodwater. The court consider's (sic) Dr. (sic) Ports' estimate of the distance the ponded backwater would reach to be too conservative and it is hereby revised to 600 feet from the 20 foot C.D. contour line.
* * * *
He [Dr. McCutcheon] did not make an estimate of the distance that the backwater effect traveled from the ponded area but it is evident that it probably exceeded the estimate of Dr. (sic) Ports.
The extension of the backwater flooding was estimated to be 600 feet from the ponded area. The border area contains thirteen homes and 3 house trailers that had flooded. It would be unfair to arbitrarily exclude these homes and *928 occupants from the class area. The court does extend said area to include said homes and trailers.
In light of the testimony from both Dr. McCutcheon and Ports that the substantial backwater effect was in fact limited to the areas of the drainage canals, we find no merit to plaintiffs' argument that the trial court erred by not including the entire area of Lower Coast Algiers in redefining the class. Nonetheless, the trial court's determination that the geographic boundary should be expanded 600 feet from the 20.0 foot CD contour line is in keeping with the Supreme Court's finding that "the flooding [was] not limited to the elevations below the elevation of the ponded water surface." Saden v. Kirby, 660 So.2d at 429. The trial court extended the class to include the small border area after the judge made an on-site inspection and determined that it would be unfair to arbitrarily exclude these homes and occupants from the class area. Based on the evidence in the record, we cannot say the trial court erred when it extended the class geographic boundary.
Defendant's assignment of error 4 addresses the trial court's determination as to the duration of the flood.
Plaintiffs argue that their damages were enhanced due to the prolonged flooding as a result of Pump B's failure. While defendant concedes that the S&WB's inability to operate DPS 11 at peak efficiency caused a delay in pumping floodwaters out of the area, it contends the duration was insignificant.
Jerome Pepper, plaintiffs' expert in hydraulic and civil engineering, testified that during the April flood event, two of the three S&WB pumps operated continuously for 108 hours and 20 minutes. Based on his calculations, he estimated that if all three pumps at DPS 11 had been operable during the storm it would have taken approximately 45-55 hours to clear the floodwaters from its suction basin. According to Pepper, the loss of Pump B approximately doubled the duration of the flood, explaining that instead of lasting two days the flood lasted anywhere from four to seven days.
Defendant argues that the addition of Pump B would not have had the effect of lowering the total pumping time [duration of the flood] from 108 hours 20 minutes to 45-55 hours as Pepper opined. It contends Pepper's calculations are erroneous because he failed to consider other means of means of egress for removing the water from the Lower Coast of Algiers, namely, the 24 inch and 60 inch culverts in the Donner Canal levee, ditches alongside Highway 406 and the gap in the Donner Canal levee that the Plaquemines Parish Government had damned. Assigning nominal capacities to all means of flood water egress, Ports determined that normal pumping operations, including Pump B, lasted anywhere from of a minimum of 54 hours, 10 minutes to a maximum of 86 hours, 40 minutes. Using a computer simulation and all available information, i.e., the elevation of culverts and various obstructions, he calculated that all three pumps would have had to run 71 hours to clear the water from the Lower Coast of Algiers. According to him, the addition of Pump B would have only reduced the total pumping time/ duration of the flood by 31% or 33 hours and 35 minutes.
The trial court did not make an exact finding as to the number of days or hours the flooding was prolonged as a result of the S&WB's negligence, but did find "more reasonable" Pepper's conclusion that if all three pumps had operated at full capacity, the water would have drained from the Lower Coast of Algiers in 45-55 hours. The trial judge accepted Pepper's testimony because there was no mechanism to measure the amount of water outflow through other drainage sources at the time of the flood. Pepper compensated for this unknown variable by using an hour-based range approximation, while Ports attempted to calculate the total number of cubic feet of water that was removed and made *929 a 95,000,000 cubic foot error in doing so. The judge agreed with Pepper's testimony that, based on Ports' calculations, more water was pumped from the Lower Coast of Algiers than actually fell during the storm. He also agreed with Pepper's testimony that the best way to undermine the significance of the loss of Pump B was to exaggerate the outflow from the other drainage sources.
Both experts gave testimony regarding the failure of Pump B on the duration of the flood. Their testimony differed in some respects but the trial judge found Pepper's testimony to be more reasonable. Keeping in mind the standard of review on appeal, we cannot say the trial judge's finding on this issue was clearly wrong.
Defendants' assignments of error 5-8 question the trial court's determination of damages as to the permanent structures in the area affected by the floodwaters.
Again, the defendant contends the trial judge erred in accepting the testimony of plaintiffs' expert witness, Joseph Caulfield, regarding the assessment of flood damages to the houses in the Lower Coast of Algiers.
Caulfield, a licensed public adjuster from St. Louis, Missouri, testified that his firm specialized in flood damage assessments and that he participated in more than 2000 flood damage claims in Illinois and Missouri. He also testified that 90% of his work involved residential structures. Caulfield testified that he sent two employees to Louisiana in January 1997 to inspect twenty-three houses in the Lower Coast of Algiers. These two employees measured the structures, took photographs, and compiled an estimate of the cost to tear down and rebuild each structure. Based on his employees' findings, Caulfield compiled an extensive, detailed report, which plaintiffs introduced into evidence. The report contained individual replacement cost values less depreciation for each of the twenty-three structures. The items considered in each estimate included all interior and exterior building materials, their individual costs, labor costs, demolition costs, taxes and permit fees. In addition to the replacement estimates, Caulfield's report included photographs of several damaged structures. Caulfield came up with a damage figure of $31,236 per structure. In his opinion, the additional 2½ inches of water and the prolongation of flooding caused by the negligence of the S&WB was significant.
Two defense experts, Ports and William Springer, also testified regarding structural damage. They testified that the damage to each structure was $1,107.60, an estimate significantly less than the $31,236 figure reached by Caulfield. However, the trial court chose to disregard their testimony in large part because Springer admitted that he did not consider himself a flood damage expert and the defense attempted to present Ports as an omnibus expert. After reviewing the conflicting evidence in this record, we cannot say the trial judge erred in relying on Caulfield's calculations and method of determining structural damages.
Defendant's assignments of error 8-11 contest the trial court's award of $60,000 for damages sustained by plaintiffs' mobile homes and $348,100 for damages sustained by other personal property.
In raising these assignments of error, defendant argues the trial court erred in accepting plaintiffs' expert, Mrs. Ann Russell's, valuations for personal property and trailer damages. Defendant criticizes Mrs. Russell's method of valuation, as she used the 1983 replacement costs of all items, with the exception of motor vehicles, rather than their depreciated market value. It further argues that Mrs. Russell, like Caulfield, failed to determine which personal property and trailer damages were caused by the incremental and prolonged flooding as the result of Pump B's failure and which were caused by other floodwaters.
*930 At trial, plaintiffs claimed personal property losses, which included animals, crops, gardens, appliances, household furnishings, clothing, vehicles, yard equipment, tools and lost wages. Mrs. Russell, a certified real estate appraiser, testified that she had been an appraiser since 1984 and had appraised personal property in the context of business and apartment sales. In determining the personal property values and compiling her report, she used the Louisiana Cooperative Extension Service, the Sears 1983 spring, fall and Christmas catalogues, and the National Automobile Dealers Association (NADA) blue book.
As to the various personal property items, Mrs. Russell testified that she determined the lowest price for a particular item in an effort to give the most reasonable estimate in 1983 prices. In obtaining an average loss for the entire class, Mrs. Russell explained that she computed the average by discarding the lowest and highest total reported loss to achieve the most accurate average. She also used 1983 replacement values rather than the depreciated market value of items. Mrs. Russell prepared estimates for 56 families based on questionnaires submitted to class members shortly after the flood. The total personal property loss for all 56 families was $593,765. She calculated the total average personal property loss at $375,952. She then divided this figure by 54 [56 households minus the highest and lowest household totals] and determined an average loss in personal property of $6,962 per family. Mrs. Russell further explained that according to the 1980 census tract, which was admitted into evidence, there were 163 households in the Lower Coast of Algiers at the time of the flood. In light of this, she testified there were 107 additional potential claims totaling $744,934 [107 × $6,962]. Mrs. Russell then totaled the amount of submitted and potential claims [$593,765 + $744,934] for total damages of personal property of $1,338,699. To this figure, she multiplied 1.62, the consumer price index (CPI) from April 1983 to August 1996, the date of her appraisal. According to Mrs. Russell, the CPI allowed her to adjust for inflation. Her final calculation for total property loss, considering inflation, was $2,168,692.
Regarding valuation for mobile homes, Mrs. Russell testified that she researched mobile home values by consulting with a mobile home dealer in Baton Rouge to determine the cost of an available mobile home in 1975. She then used the NADA book to determine that the 1983 value of the mobile home was $5000.00.
It is clear from his reasons for judgment that the trial judge found Mrs. Russell to be a credible witness and accepted her method of calculating personal property damages. He found her figures of $6,962, average personal property loss per family, and $5000, the replacement cost per trailer, to be accurate but found that the CPI was not applicable in this case.
Notably, the defendant offered no expert testimony to refute Mrs. Russell's testimony. Absent such evidence, we cannot say the trial judge erred in accepting the method and sources used by Mrs. Russell in calculating personal property and trailer damages.
Defendant's assignments of error 13 and 14 contest the trial judge's award of $2,130,128 to the plaintiffs for the devaluation of their real property.
Defendant argues that the trial judge erred in relying on the testimony of plaintiffs' expert witnesses, Oren Russell, a licensed real estate appraiser, and Dr. John Glascock, a professor in finance and real estate at the University of Connecticut, who testified that the lots and raw acreage in the Lower Coast of Algiers decreased in value as a result of the April 1983 flood.
Russell testified that he did not apply appraisal techniques or the standards set forth by the Appraisal Institute or the Society of Real Appraisers in compiling his reports, explaining that he was not rendering an appraisal but rather a trend study *931 on the effect of the April 1983 flood on real estate values in the Lower Coast of Algiers. He prepared four reports, the original dated September 27, 1996, the second dated January 14, 1997, and two others dated March 9 and 24, 1997, respectively. Russell selected a "control area" on the opposite or west side of the Intracoastal Waterway from the Lower Coast of Algiers, which, according to him, was similar in most relevant market aspects as the "target area" on the east side of the Intracoastal Waterway, namely, the Lower Coast of Algiers. He explained that the control area did not flood but portions of the target area did, and he compared sales in the two areas for the years 1979 through 1986. Russell further explained that he had counted the lots and partial lots in the entire Lower Coast of Algiers. According to him, including partial lots, which were counted as half-lots, there were a total of 4,055 lots in this area. Based on his trend study, Russell found the value of the real estate fell in the target area after the flood event of April 7, 1983, yet increased in the control area after the flood. He calculated the decrease in value per lot to be $864.
One of the issues in dispute at trial was whether certain non-arms length transactions should have been considered in determining whether land sale values had decreased as a result of the 1983 flood. In reviewing the evidence, we note Russell took into account non-arms length sales. Frank Delery, defendant's real estate expert, on the other hand, testified that in arriving at a true market value of the lot sales, all non-arms length transactions should have been disregarded. He explained that sales between related parties or parties where there was financial distress would not have provided a true picture of market value since undue stimulus would have adversely affected market value. Russell agreed with Delery that in an appraisal non-arms length sales should be disregarded, however, he stated that a trend study may disregard such safeguards.
Dr. Glascock testified that the only way to determine the effect of the flood on real estate values was through a control study such as the one done by Russell. After reviewing the study and reports, Dr. Glascock concluded the market indicated the flood had a negative and stigmatizing effect on the property in the area, diminishing its value for some period of time. However, after deleting some, but not all, of the non-arms length transactions, Dr. Glascock recalculated the loss of value to be $539 per lot as opposed to $864 per lot.
Dr. Wade Ragas, Professor and Director of the Real Estate Program at the University of New Orleans, testified that he reviewed both Russell's and Delery's reports. According to him, Russell and Dr. Glascock failed to include at least five sales in 1985 and all of the English Turn sales in 1986 in calculating the value of the raw acreage in the Lower Coast of Algiers. In Dr. Ragas' opinion, the flood had no effect on the value of the vacant lots and/or raw acreage in the Lower Coast of Algiers.
In rendering its judgment, the trial judge found Russell and Dr. Glascock's studies more probative and relied on Dr. Glascock's estimate of $539 decrease in value per lot in the Lower Coast of Algiers as a result of the April 1983 flood. After a thorough review of the evidence put forth by both parties' experts, we find the trial court clearly erred in determining that the lots and raw acreage in the Lower Coast of Algiers sustained a loss in value as a result of Pump B's failure.
Regarding this particular category of damages, plaintiffs' experts acknowledged that there was no actual damage to the land itself but rather a loss of value to the lots as a result of the single flood occurrence. Based on a trend study, it was clearly unreasonable for the trial court to conclude that the addition of 2½ inches of water as a result of Pump B's failure to the several feet of water caused by the "act of God" caused a decrease in the land value. It was also illogical for the trial court to conclude that the unimproved *932 property sustained a decrease in value a result of the prolonged flooding caused by the S&WB's one-time, single pump failure. We therefore reverse and vacate the trial court's award of damages for real estate devaluation.
In light of our decision to reverse the award of damages for real estate devaluation, we pretermit the issue of whether the trial court erred in expanding the class to include non-resident property owners.
Defendant's last assignment of error, no. 15, questions whether emotional and psychological damages were appropriate in this case. In their answer to the appeal, plaintiffs counter that the award was too low.
In rendering judgment on the issue of damages for emotional and psychological distress and inconvenience, the trial judge considered the testimony from both plaintiffs' and defendant's experts. In his reasons for judgment, he summarized the testimony from Dr. Gerald Murphy, the licensed clinical social worker who testified for the plaintiffs. The judge concluded that Dr. Murphy's findings did not meet the minimum standards for the admissibility of scientific expert testimony as enunciated by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993). While neither accepting nor rejecting the testimony from defense expert, Dr. Richard Richoux, a psychiatrist, the trial judge noted that both Drs. Murphy and Richoux, agreed that manmade disasters, especially those caused by governmental neglect, can exacerbate psychological stress.
The testimony of several plaintiffs supports the court's conclusion that they suffered emotional damages and were inconvenienced as a result of the flood. Several testified they had fears of drowning while others testified they suffered severe anxiety over losing personal belongings and being trapped for three to four days as a result of the flood waters. One of the plaintiffs testified that he feared his house would catch fire due to electrical problems and slept in his car for two days. Nonetheless, there is no evidence that any of the plaintiffs sought medical treatment for their psychological injuries. Based on the evidence, we cannot say the trial court erred in awarding $5,000 per class plaintiff for the emotional and psychological damages sustained as a result the flood.
Plaintiffs' assignment of error no. 4 asserts that the trial judge erred in reversing its original award and removing the CPI adjustment.
Plaintiffs' argue that a CPI adjustment is warranted because this case has taken so long to reach a conclusion. Their experts, Mr. and Mrs. Russell and Dr. Glascock, testified they applied the Consumer Price Index in determining the real and personal property losses. According to them the CPI was warranted to bring a past lost up to present value. In support of their argument, plaintiffs rely on the case Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993), wherein the Louisiana Supreme Court held that when property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was immediately preceding the damage.
Because we reverse the trial court's award of damages for a decrease in real estate values, we need not consider whether a CPI adjustment is applicable to this item of damages. As to personal property damages, after considering the jurisprudence, we find the trial court was correct in not applying the CPI to these losses. To enhance an award through the use of the CPI would be to award personal property losses occurring in 1983 at the 1998 value, which the trial court could not lawfully do.
*933 Plaintiffs' assignment of error 1 in the answer to the appeal addresses the issue of whether the trial judge erred in not applying the doctrine of concurrent causation, which, in effect, would make the S&WB responsible for all the damages caused by its negligence concurring with an Act of God.
The plaintiffs raised this issue in a motion in limine, which both the trial and appellate courts denied. The Supreme Court agreed, denying plaintiffs' writ application in Saden v. Kirby, 97-0546 (La.3/3/97), 690 So.2d 1. In light of the Supreme Court's action, the issue was final. Nonetheless, it is clear from the trial court's judgment that it allocated one hundred percent (100%) of the fault for the damages sustained by the plaintiffs in the April 1983 flood to the S&WB. We find the trial court clearly erred in doing so.
After the court of appeal finds "clearly wrong" an apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607.
The appellate courts of this state have been guided by the factors enunciated by the Supreme Court in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). These factors are:
(1) whether the conduct results from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Id. at 974.
In the instant case, the Supreme Court found that "the S&WB was liable for plaintiffs' damages caused by the additional and prolonged flooding" but not for all of the damages associated with the flood. Saden v. Kirby, 660 So.2d at 430. A portion of these damages must also be attributed to the "force majeure." Id. at. 428. Nevertheless, the additional 2½ inches of water attributable to the negligence of the S&WB were very significant; these additional 2½ inches of floodwater not only raised the water level but also prolonged the duration of the flood by several days.
The S&WB is the agency charged with the responsibility of maintaining adequate drainage so that flooding does not occur. The S&WB allowed the feeder line that supplied power to the two large pumps at DPS 11 to remain out of service for almost three months when it was well aware that this area was often subject to heavy rainfalls, albeit not usually of the same magnitude as that experienced on April 6 through April 7, 1983. We agree that a portion of the flood damage was the result of Pump B's failure but find the trial court was wrong in assessing all the damages against the S&WB. We find the highest percentage of fault that the court could reasonably assess to the S&WB for damages to the plaintiffs' structures, mobile homes, personal property and for their emotional and psychological suffering is fifty percent (50%).

CONCLUSION
Accordingly, for the foregoing reasons, we reverse the trial court judgment in part, vacating the award of $2,130,128.00 to plaintiffs' for real estate devaluation. We amend the trial court judgment, reducing by 50% the award of damages for plaintiffs' structures, mobile homes, personal property and their emotional and psychological suffering. As amended, the total award to plaintiffs reads as follows:

Structural Damages ($31,236 × 37 structures
× .50) $ 577,866.00
Mobile Homes ($5,000 × 12 trailers × .50) 30,000.00
Personal Property ($6,962 × 50 house-holds
× .50) 174,050.00
Emotional/Psychological Suffering ($5000
× 170 × .50) 425,000.00
 _____________
TOTAL DAMAGES $1,206,916.00
Less S & WB's self-insured retention -500,000.00
 _____________
TOTAL AWARD $ 706,916.00

*934 REVERSED IN PART AND AMENDED IN PART.
ARMSTRONG, J., CONCURS IN THE RESULT.
LANDRIEU, J., DISSENTS IN PART AND CONCURS IN PART.
McKAY, J., CONCURS IN PART AND DISSENTS IN PART.
ARMSTRONG, J., CONCURRING IN THE RESULT.
I concur in the result reached by Judges Jones and Waltzer.
LANDRIEU, J., DISSENTING IN PART AND CONCURRING IN PART.
I respectfully dissent in part from the per curiam opinion for the following reasons.
First, I find the majority erred in affirming the trial court's extension of the class geographical boundary to 600 feet beyond the 20.0 foot CD contour and including the adjacent border area within the class boundary based on a site inspection done more than 14 years after the flood. In its earlier opinion in Saden v. Kirby, 660 So.2d at 431, the Supreme Court noted that the backwater and mounding effect had completely dissipated by 3:30 p.m. on April 7, as the water elevation in the ponded area never rose above 20.0 foot CD and no significant amount of rain necessary to produce further backwater fell after 10:00 a.m. In this case, both parties' experts testified that the backwater effect lessened and dissipated the farther the distance the water flowed from the ponded area and was limited primarily to the areas of the drainage canals. However, Mr. Ports, the defense expert, was the only expert to testify that the backwater traveled a distance of 100-200 feet. Because the plaintiffs put forth no evidence as to the distance the backwater traveled, the record only supports a finding that the backwater effect extended, at the very most, to 200 feet beyond the ponded area. To the extent the trial court determined it extended 600 feet beyond the 20.0 foot CD contour and extended the class geographical boundary to include the adjacent border area, I find it clearly erred. Unlike the majority, I find any flood damages sustained by those properties located beyond 200 feet from the 20.0 foot CD contour cannot be attributed to the S&WB's failed pump.
Second, I disagree with majority's finding no error in the trial court's award of damages for the structures. The trial court accepted Mr. Caulfield's damage estimate of $31,236 per structure. This estimated figure, the average depreciated cost of razing and rebuilding each home, was based on his theory that the additional and prolonged floodwaters caused irreversible wood rot to the wooden structures. Unlike the trial court and the majority, I do not find Mr. Caulfield, a licensed public adjuster, possessed the expertise to testify regarding the nature and composition of wooden structural components. Although Mr. Caulfield's report was extensive, containing exact measurements and costs for interior and exterior items for each structure, he offered nothing to support his theory of irreversible wood rot other than his own opinion. I also note that Mr. Caulfield made no determination as to how high the water rose or how long it remained in any of the houses, and he personally made no inspection any of the houses prior to compiling his report. Most telling, however, are the photographs and other exhibits, which clearly indicate that the homes in the area were old and many in a state of decay due to years of neglect. These photographs depict structures with extensive water damage and wood rot due to faulty plumbing, damaged roofs, makeshift foundations and termites. While acknowledging that the photographs were taken thirteen years after the flood, it defies reason to conclude the extent of the depicted damage was the result of an additional 2½ inches of standing water that lasted at most five days. Even completely *935 discounting the defendant's experts' method of estimating structural damage, as the trial court did, I find Mr. Caulfield's methodology was both unreliable and unreasonable.
Third, I believe the trial court erred in awarding $5000 per plaintiff for the emotional and psychological damages they allegedly sustained as a result of a flood. Although the residents of Lower Coast Algiers were inconvenienced and somewhat emotionally distraught because of the flood, the evidence fails to distinguish how much worse any of them may have felt because of the 2½ inches of additional water or the extended duration as opposed to the natural occurrence of the flood. Absent the S&WB's negligence, the plaintiffs still would have been inconvenienced and distressed. Clearly, the evidence does not support a finding that plaintiffs' inconvenience and emotional distress can be attributed to the S&WB's one time, single pump failure. No members of the class sought psychological help and there is insufficient medical testimony to support an award of $5000 to every adult and child living in the affected area.
Fourth, I disagree with the majority's allocating 50% of the fault for the total damages as a result of the April 7 flood to the S&WB. Although the majority recognizes that the trial court erred in attributing 100% of the fault for plaintiffs' damages to the S&WB, it resolved the issue by simply splitting the "baby" in half. The flood was an "Act of God," where heavy rains caused as much as three or more feet of water to accumulate in some areas. The S&WB's failure to have all three pumps operational caused an additional 2½ inches of water in the "ponded" area. Although Mr. Jerome Pepper, plaintiffs' expert in hydraulics, testified the loss of Pump B approximately doubled the duration of the flood, he admitted on cross-examination that the addition of the third pump would not have doubled the pumping capacity. Also, there is ample testimony from the plaintiffs that the water did not remain in their houses, trailers or vehicles the entire time. Even if you attribute 50% of the fault for the duration of the flood to the S&WB, the S&WB cannot be responsible for 50% of plaintiffs' total damages where its contribution to the total depth of the flood was minimal, as all but 2½ inches of the floodwater was caused by the heavy rain.
Suppose that the flood was not caused by an act of God but rather by a negligent break in a canal levee caused by a third party such as a contractor. Furthermore, assume that the S&WB pump was inoperable as it was in this case. Would it be reasonable to conclude that the S&WB was 50% at fault when its negligence caused the floodwaters to be only 2½ inches higher than the 36 to 48 inches of water that resulted from the break in the levee. The Supreme Court restated the well founded principle that the S&WB was only responsible "for any damages that would not have occurred but for its own conduct or omission." Saden v. Kirby, 660 So.2d at 428. While it took two or three additional days to pump out the last drop of water from the lowest point of the basin, the floodwaters remained in the homes and trailers for only a small part of that time.
The fact that God is not subject to La. Civ.Code. art. 2315 and cannot be cast in judgment is no reason to assign to a viable tortfeasor a greater portion of the total damages than that tortfeasor caused. Thus, I believe 20% is the highest percentage of fault that can be allocated to the S&WB for plaintiffs' total damages as a result of the April 1983 flood in the Lower Coast of Algiers. Any percentage greater than this is clearly unreasonable in light of the evidence.
I concur in the majority opinion insofar as it reversed the award of damages for the devaluation of the land. The property which is the basis of this particular award consisted of a "paper subdivision" comprised of approximately 4000 mostly wooded lots with no drainage or utilities and extremely poor access to the general area. *936 Plaintiffs relied on Mr. Russell's trend study to support their claim that the flood had a stigmatizing effect on this property. After reviewing the record, I can only conclude the trial court erred in determining the trend study was reasonable and sufficient to prove the property values had declined as a result of the S&WB's negligence.
According to Mr. Russell, he selected the control area on the west side of the Intracoastal Waterway to compare to the target area on the east side because it was similar in most respects. The evidence indicates otherwise. Between 1967 and 1989, the control area underwent substantial development. Subdivisions were created, homes were built, roads were constructed and the sewerage system was installed to accommodate the growth. By 1989, there was very little land in the control area that remained undeveloped. The target area, which flooded, by contrast, sustained no growth during that same period. There was no subdivision development and new road construction of any type. The only activity in the target area was a sewer system built by the S&WB in 1979. Only when the high-rise Intracoastal Waterway bridge was built in 1987 did any type of development begin in Lower Coast Algiers, namely, English Turn. The high-rise bridge finally made Lower Coast Algiers easily accessible. Prior to this time, the area was undeveloped and lacked an infrastructure, making it unattractive to financial lending institutions that would have otherwise loaned money to prospective home buyers or builders. A comparison of the property sales in the control area to those in the target area for periods before and after the flood was completely unreliable. As I see it, any stigmatizing effect on the lot values following the flood was due not to the flood but rather to the location of the property. In any event, even if we assume there was a small temporary loss of value to the lots because of the flood, that loss cannot be attributed to the S&WB for its one-time pump failure as an additional 2½ inches of water for an extended period of time would have had no measurable effect on unimproved land.
Finally, although the per curiam opinion pretermits the issue, I find the trial court erred in expanding the class to include non-resident property owners as plaintiffs at such a late stage in the litigation. The cause of action arose in 1983 and the judgment from the liability phase was final in 1996. Even though plaintiffs' seventh amended and supplemental petition asserted claims which arose out of the same flood event as alleged in the original petition, the passage of nearly 14 years from the filing of the original petition to the addition of the amended claims of the non-resident property owners in 1997 surely prejudiced the defendant in conducting its defense.
I note also that under former La. Code of Civ. Proc. art. 592, the maintenance of a class action required the presence of a class representative who would fairly insure the adequate representation of all class members. Yet, the record discloses that Arthur Devore, the only alleged nonresident property owner, did not actually own his property in the Lower Coast Algiers until after the flood. Under the circumstances, I find the trial court erred in finding the non-resident property owners' claims had not prescribed.
McKAY, J. CONCURRING IN PART AND DISSENTING IN PART.
I concur with the per curiam in so far as it affirms the findings of the trial court and amends the judgment to reflect that S&WB is responsible for only 50 % of the plaintiffs' damages. However, I respectfully dissent from the decision to reverse the trial court's award for real estate devaluation.
The trial court awarded $2,130.128.00 ($539 × 3,952 lots) in damages for real estate devaluation. In reaching this figure, the trial court relied primarily upon the testimony of the plaintiffs' expert witnesses, Mr. Oren Russell and Dr. John *937 Glascock. The defendants also produced experts on the subject, namely Dr. Wade Ragas and Mr. Frank Delery. Mr. Russell and Mr. Delery each gathered data regarding real estate values for the Lower Coast of Algiers. Dr. Glascock's analysis of the Russell and Delery data found a distinct property devaluation caused by the flood. Furthermore, there is nothing in the record to contradict Dr. Glascock's testimony that the increased level and duration of a flood has a stigmatizing effect on property, diminishing its value for some period of time.
Although a great deal of data and theory regarding real estate devaluation was presented, I do not believe the trial court was unreasonable in relying upon the testimony of the plaintiffs' experts. When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La. 1987); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Therefore, I do not believe that the trial court's award of damages for real estate devaluation was manifestly erroneous.
NOTES
[1] "CD" is an abbreviation for "Cairo Datum," which is an artificial measuring system used frequently by surveyors in low-lying areas where the contours of the land run above and below sea level.
[2] Louisiana Code of Civil Procedure article 592 A(3)(c) allows the court to enlarge or restructure a class.